**In re WESTERN MONETARY CONSULTANTS, Debtor.**

**Bankruptcy No. 88–B–03748–U.**

United States Bankruptcy Court, D. Colorado.

May 31, 1989.

John M. Franks, Denver, Colo., for debtor.

Edwin G. Perlmutter, Berenbaum & Weinshienk, P.C., Denver, Colo., for Security Pacific.

### MEMORANDUM OPINION AND ORDER

ROLAND J. BRUMBAUGH, Bankruptcy Judge.

This matter comes before the court upon an Application for Approval of Administrative Expense filed on behalf of Security Pacific Mortgage and Real Estate Services, Inc. ("Security Pacific").

In February 1987, the Debtor entered into a five-year lease with Security Pacific. The leased premises consisted of two floors of an office building located at 2850

McClelland Drive, Fort Collins, Colorado totaling 23,190 square feet. The monthly rental rate under the lease was $27,055, calculated at $14.00 per square foot. Additionally, the lease provided for a payment of $3.25 per square foot for the Debtor's pro rata share of building operating expenses such as taxes, insurance, utilities and maintenance.

The Debtor filed for protection under Chapter 11 of the Bankruptcy Code on March 28, 1988. Debtor continued to occupy one floor of the premises until August 1, 1988,[1] at which time it vacated the premises. The Debtor did not assume the lease, and it was therefore rejected by operation of law 60 days after the bankruptcy filing. The Debtor made no rental payments after filing its petition.

Security Pacific asserts that the full contractual rental for April, May, June and July 1988 is due and owing to it. It is the Debtor's contention that it owes only the fair rental value of the leased premises that it actually used and occupied. For ease of discussion, this court will break the time in question into two periods: the first 60 days of the lease after the bankruptcy was filed (April and May), and the approximately 60 days following that (June and July).

Since the Bankruptcy Code was amended with the enactment of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98-353, 98 Stat. 333, it is clear that, for the first 60 days of the bankruptcy, a trustee must pay the full rental value of the lease; i.e., the rental set out in the lease document.

> Section 365(d)(3) as enacted in 1984 provides: The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60-day period. This subsection shall not be deemed to affect the trustee's obligations under the provisions of subsection (b) or (f) of this section. Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under this title.

Section 365(d)(4) as enacted in 1984 provides: Notwithstanding paragraphs (1) and (2), in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

Not only is the trustee to pay the full rental value, but he is to pay it in a timely manner. In the conference report that appears in 130 Cong.Rec. S8894-95 (daily ed. June 29, 1984) it was stated:

> A second and related problem is that during the time the debtor has vacated space but has not yet decided whether to assume or reject the lease, the trustee has stopped making payments due under the lease. Lease payments include rent due the landlord and common charges which are paid by all the tenants according to the amount of space they lease. In this situation, the landlord is forced to provide current services—the use of its property, utilities, security, and other services—without current payment. No other creditor is put in this position. In addition, the other tenants often must

---

**1.** There is some dispute as to the exact date the Debtor vacated the premises. Security Pacific claims the space was not vacated until August 20, 1988. Debtor claims it vacated as of August 1, 1988. However, since Security Pacific is re- questing an administrative claim only through July 31, 1988, the court will accept the date of August 1, 1988 as the date the premises were vacated.

increase their common area charge payments to compensate for the trustee's failure to make the required payments for the debtor.

The bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property at the time required in the lease. This timely performance requirement will insure that debtor-tenants pay their rent, common area and other charges on time pending the trustee's assumption or rejection of the lease. For cause the court can extend the time for performance of obligations due during the first 60 days after the order for relief, but not beyond the end of such 60-day period. At the end of this period, the amounts due during the first 60 days would be required to be paid, and thereafter, all obligations must be performed on time. This permissible 60-day grace period is intended to give the trustee time to determine what lease obligations the debtor has and to locate the cash to make the required payments in exceptionally large or complicated cases.

The court in *In re Homeowner's Outlet Mall Exchange, Inc.*, 89 B.R. 965 (Bkrtcy. S.D.Fla.1988) set out four significant consequences for non-residential lessors following enactment of Section 365(d)(3) and (d)(4).

1. The trustee is limited to a 60-day period in which to decide to assume or reject the lease, which may be extended for cause.

2. The rental falling due during the first 60-day period is an allowable administrative expense without the necessity of notice and hearing, as is ordinarily required by Section 503(b).

3. The amount of the administrative expense claim arising in the 60-day period is governed exclusively by the terms of the lease. Any necessity for showing the reasonableness of the rent has been completely abrogated by Section 365(d)(3).

4. While the court may extend the deadline for assumption or rejection of the lease for cause, the deadline for payment of the rental payments falling due within the 60-day period, may not be extended beyond the 60-day period.

 For the first 60-day period, no showing of reasonableness must be made. As long as the lease is not rejected, an administrative expense is allowed at the contractual rate of the lease, without notice and hearing, and this amount must be paid at the end of the 60-day period. This is a view followed both in this and other districts. *In re National Oil Co.*, 80 B.R. 525 (Bkrtcy.D.Colo.1987), *In re Granada, Inc.*, 88 B.R. 369 (Bkrtcy.D.Utah 1988), *In re Fisher & Fisher*, 51 B.R. 680 (Bkrtcy.S.D. Ohio 1985). Applying these consequences to the case at bar, the Debtor must pay to Security Pacific for the first 60 days following the filing of its bankruptcy petition, the rent as set out in the terms of the lease ($54,110.00 in base rent and $3,476.28 in operating expenses); and this amount must be paid immediately, as it should have been paid 60 days after March 28, 1988.

The rent for the second 60-day period following the filing of the bankruptcy petition is determined in a different manner. The amount of this administrative expense claim is valued using an objective worth standard that measures the fair and reasonable value of the lease, though a rebuttable presumption exists that the contractual rental rate is fair and reasonable. This amount may be adjusted upward or downward to reflect the extent to which the debtor actually used the demised premises. *In re Dant & Russell, Inc.*, 853 F.2d 700 (9th Cir.1988), *In re Thompson*, 788 F.2d 560 (9th Cir.1986), *Matter of Braniff Airways, Inc.*, 783 F.2d 1283 (5th Cir.1986). It is the Debtor's assertion that since they only used one-half of the premises, they should only have to pay one-half of the rent. Alternatively, the Debtor asks that this court determine the amount of the rent based on the use of the premises as storage space. Neither of these arguments are persuasive. It is true that the amount of the rent may be adjusted downward to reflect the Debtor's actual use. However, in the case at bar, because of the elaborate security procedures necessary for the Debtor's business, Security Pacific,

as well as the general public, was effectively locked out of most of the premises. Security Pacific had access to the reception area on one floor, and to no other area. Under these circumstances, though the Debtor claims it did not actually use and occupy all of the premises, its use and occupancy was constructive, such that it excluded all others. Therefore, this court will not adjust the rent downward based on the debtor's actual use and occupancy of the premises. Nor will it reduce the rent because one-half of the premises was used for storage. The actual use to which the Debtor has put the premises is not determinative. The fair and reasonable value of the lease upon the open market must control. *In re Thompson*, 788 F.2d 560 (9th Cir.1986). This fair market value is not based on the fact that the debtor happens to be using its expensively finished office space for storage.

The question left to be resolved then is what was the fair market value of the leased premises during the months of June and July of 1988. Debtor's expert, Mr. Craig Hau, testified that the fair market value of the lease *today* would be from $10 to $11 per square foot gross, including tax, insurance, utilities and common maintenance, making the net rental between $7 and $7.50 per square foot. He also testified that the rental rates have been declining since before the summer of 1988, and to arrive at his estimate of a fair market value today he did a "certain amount of averaging." It is irrelevant what a fair market value is today—the court must determine what was a fair market value during June and July of 1988. Since Mr. Hau was testifying to what a fair market rate would be today, and not to what a fair market rate would have been in June and July of 1988, the court cannot give his testimony a great deal of weight.

The expert called by Security Pacific, Mr. David Veldman, did testify as to his opinion of a fair market value as of June and July of 1988. He testified that a reasonable rental rate for the lease in question would have been $14 per square foot for the period April through July of 1988. He did not indicate if this was a net or gross figure. Because Mr. Veldman testified as to the fair market value in June and July of 1988, rather than as of today, this court must give his testimony greater weight than that of Mr. Hau.

Mr. Veldman also testified that Security Pacific entered into a listing agreement with him during the summer of 1988 to re-let the premises at the rate of $11 per square foot. The fact that Security Pacific was attempting to re-let the premises at this rate is not an admission on their part as to its estimate of what a reasonable rental rate would be; rather, it was in the nature of an offer to potential lessees. This court finds that $14 per square foot is a reasonable rent for the premises during the months of June and July of 1988.

The Debtor presented no testimony regarding the reasonableness of the $3.25 per square foot as Debtor's pro rata share of building operating expenses; therefore, the presumption that, as part of the lease, it was reasonable, remains unrebutted.

ORDERED that Debtor is immediately to pay to Security Pacific the sum of $54,110.00 in base rent and $3,476.28 in operating expenses for the first 60 days following the filing of the bankruptcy petition.

FURTHER ORDERED that the amount of $54,110.00 in base rent and $3,476.28 in operating expenses shall be allowed as an administrative claim for rent for the months of June and July 1988.