In re **ORIENT RIVER INVESTMENTS, INC. d/b/a New York City Shoes, Debtor.**

**Bankruptcy No. 89–12206S.**

United States Bankruptcy Court, E.D. Pennsylvania.

March 21, 1990.

Steven B. Mirow, Philadelphia, Pa., for debtor.

J. Scott Victor, Shaiman, Phelan, Victor & Mashmeyer, P.C., Philadelphia, Pa., for landlord.

James J. O'Connell, Asst. U.S. Trustee, Philadelphia, Pa., U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant contested matter, involving a dispute between a Debtor-tenant and its former landlord, presents at least two novel issues of state law and one difficult issue of bankruptcy law. Unfortunately, the underlying facts are, in several respects, somewhat muddled. Making our best effort to sort out the facts and apply the law to them, we conclude that the Debtor is liable to the Landlord in the amount of $6,515.00 for officious use and occupancy of a portion of a basement in the rented space; that the Debtor is liable for its full pro rata share of taxes on the premises, passed through in the lease, from June 15, 1989, to August 31, 1989, amounting to $4,006.25; but that it is not obliged to forfeit rent-credits totalling $10,077.50 simply because it paid its rent about thirty days late throughout the pertinent period. On the bankruptcy law issue, we hold that 11 U.S.C. § 365(d)(3) does not oblige the Debtor to pay the $10,521.25 valid administrative claim of the Landlord to it immediately, since there is no evidence that the Debtor's reorganization will result in payment of all administrative claims.

### B. GENERAL UNDERLYING FACTS

A brief history of the instant Chapter 11 case is set forth in an Opinion of October 16, 1989, published at 105 B.R. 790, 791–92. The Debtor is the purchaser of most of the assets of predecessor debtor in this court, New York City Shoes, Inc., Bankr. No. 87–03426S (hereinafter "NYC Shoes"). The Landlord, Marple XYZ Associates ("the Landlord"), rented out space situated in the former S. Klein Department Store in the Marple–Springfield Shopping Center, Marple Township, Delaware County, Pennsylvania, which was used by NYC Shoes and thereafter by the Debtor for a retail store, warehouse space, and main offices.

The genealogy of the parties' relationship can be traced to a Sublease of February 8, 1979, from S. Klein, which was a tenant of the owner of the shopping center, an affiliate of the Landlord named Marple ABC Associates, to two of NYC Shoes' predecessor. On September 30, 1987, S. Klein's Sublease was assigned to the Landlord. On January 16, 1988, NYC Shoes' interest in the Sublease was assigned to the Debtor.

On or about March 3, 1989, the Landlord and the Debtor executed a Second Amendment [lease] Agreement (the "the 2d Amendment"). By the terms of the 2d Amendment, the Debtor agreed to relinquish 8,556 square feet of space in its tenancy in exchange for rent-credits, effective April 1, 1989. The 2d Agreement also provided as follows:

11. Should Tenant breach the Sub-Lease Agreement, or any Amendment, the Stipulation for Assignment of Lease, or this Second Amendment Agreement and such breach continues for thirty (30) days from the date thereof or twenty (20) days from written notice to Tenant from Landlord of such breach, whichever is a lesser time period, then the provision of this Second Amendment Agreement with respect to the credits of Tenant for a lesser amount of offices and warehouse

space under Paragraphs 3 and 4 hereof, is terminated and Tenant shall be financially responsible for the entire approximate 18,938 square feet in the basement of the building aforesaid, as otherwise provided in Paragraph 7(a) in the Amendment Agreement of January 26, 1988.

The Debtor filed its voluntary Chapter 11 bankruptcy petition on June 15, 1989. Although not made part of the record, the parties apparently negotiated a further lease amendment, dated September 15, 1989, which was effective September 1, 1989. On February 7, 1990, this court approved a Stipulation rejecting "the realty lease" (not further identified) for the premises, effective October 1, 1989. The Debtor apparently vacated the premises later in February, 1990.

There are four issues presented. We will discuss the underlying facts and make a resolution of each in turn.

## C. THE LANDLORD IS NOT ENTITLED TO EFFECT A FORFEITURE OF THE DEBTOR'S RENT–CREDITS OF OVER $10,000 SIMPLY BECAUSE THE DEBTOR WAS TARDY IN PAYING ITS RENTS.

■ The Debtor remitted its monthly rent of $12,772.58 about 30 days late in each month that the 2d Amendment was effective, i.e., from April through August, 1989. Each month, the Landlord's agent sent letters to the Debtor's principal warning that the Debtor was in default under all of the applicable lease agreements. On August 11, 1989, the Landlord's agent wrote a letter indicating that the rent-credits were "withdrawn" under paragraph 11 of the 2d Amendment quoted at page 3 supra, as a result of these defaults. The parties agree that the post-petition rent credits, deducted from the rent ultimately paid by the Debtor, amounted to $4,031.00 for July and August and half of this amount, or $2,015.50, for June, or a total of $10,077.50.

We refuse to allow the Landlord to enforce such a draconian penalty in response to the Debtor's rather minor delinquencies in rental payments. In In re Joshua Slo-cum, Ltd., 103 B.R. 601, 604–07 (Bankr.E. D.Pa.1989), we set forth the parameters of a landlord's claims which we would deem allowable and obliged to be paid to allow a debtor-tenant to assume a lease under 11 U.S.C. § 365(b)(1), which we found similar to the landlord's rights in assertion of a proof of claim. Id. at 605–06. We held that, while a landlord could make claims under § 365(b)(1) in addition to rent a condition for cure of a lease which a debtor assumes, any such claims were restricted to elements resulting in "actual pecuniary loss" to the landlord. Id. at 605. Thus, a landlord's claims were required to be both "authorized by the parties' agreement (here, the leases), and . . . reasonable." Id. We ultimately held, in Joshua Slocum, that enforcement of clauses prohibiting "blackouts" (closings) of stores which were unsupported by proof of damages could not be required by the landlords as a condition for lease assumptions, id. at 606–07, as well as holding that claims for attorneys' fees and common area charges not supported by evidence in the record were uncollectible. Id. at 607–09.

We note that the Landlord is seeking to have its claims classified as administrative claims, as we hold it has a right to do at pages 132–134 infra. However, it must be recalled that administrative claims are narrowly restricted, by the terms of 11 U.S.C. § 503(b)(1)(A), to matters which are necessary to preserve the debtor's estate. See In re Leedy Mortgage Co., 111 B.R. 488, 491 (Bankr.E.D.Pa.1990); In re American Int'l Airways, Inc., 77 B.R. 490, 494 (Bankr.E.D.Pa.1987); and In re Grant Broadcasting of Philadelphia, Inc., 71 B.R. 891, 897 (Bankr.E.D.Pa.1987).

In Joshua Slocum, supra, we allowed the landlords to recover late charges measured by ten (10%) percent of the monthly rents, although we recognized that this measurement was at the high threshold of the "reasonability" of such charges. Id. at 609–10. The instant claim of the Landlord that over $10,000 in rent-credits should be forfeited by reason of the Debtor's late payment of rents is, in essence, an attempt to impose late charges. However, it is effectively a late charge measured by over thirty (30%) percent of the monthly rents,

which is comparable to the draconian penalty for blackouts held unenforcible in *In re Food City, Inc.*, 95 B.R. 451 (Bankr.W.D. Tex.1988).

■ Forfeitures are not favored in Pennsylvania, particularly in lease agreements. *See In re C & C TV & Appliance, Inc.*, 103 B.R. 590, 592–93 (E.D.Pa.1989); *In re Rowe, Rowe v. Connors*, 110 B.R. 712, 719–720 (Bankr.E.D.Pa.1990); and *Jackson v. Richards 5 & 10, Inc.*, 289 Pa.Super. 445, 452, 433 A.2d 888, 892 (1981).

We discussed the issue of the range of permissible late charges in *In re Jordan*, 91 B.R. 673, 679–81 (Bankr.E.D.Pa.1988). There, we noted a line of cases holding that late charges which bear no relationship to the creditor's actual losses due to the obligor's late payments are unenforcible penalties. *Id.* at 680. Particularly persuasive to us was the decision in *Willoughby Real Estate v. Sanders*, 109 Daily Wash.L.Rptr. 1149, 1156 (D.C.App.1981), holding that, in residential leases, late charges would be limited to a one-time charge of five (5%) percent of the monthly rent or $10.00 monthly, whichever is less. *Cf. In re Tastyeast, Inc.*, 126 F.2d 879, 881–82 (3d Cir. 1942) (bankruptcy court retains equitable power to reduce non-usurious, contractual interest payable to a creditor when the amount sought is so disproportionate to the damages suffered by the obligee as to constitute a penalty for late payment).

Given this authority, we are compelled to conclude that whether the attempt by the Landlord to charge back rent-credits is characterized as a declaration of a forfeiture or an attempt to impose an excessive late charge which is in effect an impermissible penalty, the charge reflected by this sum is unenforcible against the Debtor. The Landlord's demand for recovery of the $10,077.50 rent-credit will therefore be denied in its entirety.

### D. THE DEBTOR IS OBLIGED TO PAY A REASONABLE RENT FOR THE LANDLORD'S BASEMENT SPACE WHICH IT OFFICIOUSLY USED AND OCCUPIED.

Throughout the June 15 to August 31, 1989, period, the Debtor admittedly utilized, as a warehouse for its shoes, basement space which was beneath the space leased without paying the Landlord any rent. On June 7, 1989, the Landlord wrote the following letter to the Debtor's principal regarding this matter:

It has come to our attention that you are using approximately 3,000 square feet of basement space for the storage of your inventory. This storage started on or approximately March 7, 1989 at the rate of $6.00 per square foot. The amount of $4,500.00 is now due.

Please arrange to have all of your inventory removed within five days after receipt of this letter.

No response having apparently been received, this letter was ultimately followed by another letter of August 25, 1989, stating:

We have recently learned that you were actually using 15,000 square feet of basement space for the storage of your inventory.

According to our records, you took occupancy on March 7, 1989 at the rate of $6.00 per square foot. The breakdown is as follows:

```
3/07/89 to 6/15/89—  $24,903.57
6/16/89 to 8/31/89—   18,985.89
                     _____
                     $43,889.46
```

Please forward to me your check in the amount of $43,889.46 as soon as possible.

At the hearing, the Landlord scaled down its post-petition demand of $18,985.59 by charging $3.50 per square foot for the basement space, the same rate charged to the Debtor for its other space under the 2d Agreement, resulting in a demand for $11,075.34.

■ The Debtor admitted using the space, but claimed that (1) this space had always been used as a storage area by NYC Shoes and by it prior to the execution of the 2d Agreement as a gratuity, which it had assumed continued through the pertinent period; and (2) water continuously leaked through the basement ceiling, de-

stroying many of its shoes and entitling it to damages or a rebate.

The evidence relating to the amount of space utilized was very sketchy on all sides. The $11,075.34 figure was based on an estimate by the Landlord's agent that 17 "bays" in the basement were used by the Debtor. The Debtor failed to quantify any destruction of its shoe stocks from water. The Debtor posited that the water entered due to a roof-leak, and contended that its entry recurred whenever it rained. The Landlord's agent testified that there were two floors over this basement area and that the floors above had experienced no water-leakage, rebutting the claim that there was a roof-leak. She did concede that there had been, on one occasion of indefinite date, a pipe leak causing a water-flow in the basement, which the Landlord readily repaired. She also admitted that NYC Shoes had also used this space for a warehouse, but added that NYC Shoes had paid rent at an undisclosed rate for the right to do so.

We disbelieve the Debtor's claim that it thought that the space was a gratuity during the pertinent period from June 14, 1989, to August 31, 1989, in light of the prior letter of the Landlord's agent of June 7, 1989, clearly enlightening it to the contrary. We also decline to accept the Debtor's contention that any claim for water damages to shoes is actionable. The Debtor chose to use this space even after being told not to do so and despite the recurrence (according to it) of the water leakage.

We do believe that much less than 17 bays were used. We find that, in fact, the Debtor, given its declining fortunes and number of stores, used but 10 bays during the pertinent period.

■ The issue of whether the Debtor is liable for its officious occupancy of the space requires some study of hoary Pennsylvania legal authority. Several early Pennsylvania cases establish that a landlord can recover rent on account of uncontracted use and occupancy of a premises only if the landlord is able to prove that a tenant came into possession with the permission of the landlord. *See Brolasky v.*

*Ferguson,* 48 Pa. 434, 435–36 (1865); *Pott v. Lesher,* 1 Yeates (Pa.) 576, 578 (1795); and *Eisen v. Eisen,* 66 Pa.D. & C. 347 (Phila. Co. M.C.1949) (per WINNET, J.). The only action which a landlord can properly take against a blatant trespasser is eviction. *See Pott, supra,* 1 Yeates at 578; and *Eisen, supra,* 66 Pa.D. & C. at 344.

> However, later cases have indicated that [a]n implied contract for use and occupation may arise from the use of the premises by the tenant and the sufferance of the landlord, nor does the fact that the tenant holds over after notice to quit tend to destroy this implication, unless the landlord had followed up the notice by some act indicative of an intent to treat him as a trespasser; ...

*Grove v. Barclay,* 106 Pa. 155, 164 (1884). *See also In re Alan Wood Steel Co.,* 19 B.R. 4, 5 (Bankr.E.D.Pa.1982) (by implication); *National Oil Refining Co. v. Bush,* 88 Pa. 335, 340–41 (1879); and *Maurer v. Carsonia Park, Inc.,* 73 Pa.D. & C. 287, 288–89 (Berks Co. C.P.1949). *Cf. In re Zagata Fabricators, Inc.,* 893 F.2d 624, 628–29 (3d Cir.1990).

We conclude that, despite the request by the Landlord's agent in the letter of June 7, 1989, that the Debtor remove itself from the premises, the Debtor's holding over in the space thereafter renders it a tenant of the Landlord at a sufferance rather than a pure trespasser. Since no rent was established for the use of the space, "the landlord can recover a reasonable rent ... for use and occupation." *Everly v. Shannopin Coal Co.,* 139 Pa.Super. 165, 172, 11 A.2d 700, 704 (1940).

■ We further conclude that the Landlord's contention that the reasonable rental rate was $3.50 per square foot is a high figure, but not an unreasonable one. Since we are giving the Debtor the benefit of some doubt in measuring its use of the basement as embracing only 10 bays, we feel that establishment of the rental rate of $3.50 per square foot is fair. We compute the appropriate rent to be $6,515.00. Our calculation was to divide $11,075.34 by 17, arriving at a rate of $651.50 per bay for the

period in issue. We then multiplied this figure by ten.

### E. THE LANDLORD IS ENTITLED TO THE AMOUNT CLAIMED AS A PASS–THROUGH TOWARDS REAL– ESTATE TAXES.

■ The Landlord also claims a pro-rated amount of taxes due as a pass-through under the original Sublease from S. Klein to the predecessors of NYC Shoes, which ultimately passed by various assignments to the parties. The Landlord initially claimed $4,807.50, arising in the period from June 15, 1989, to September 30, 1989. The latter date was chosen because it was the day before rejection of the lease became effective per our Order of February 7, 1990. However, we indicated at the hearing that we believed that the allowance for September, 1989, must be deducted, because the parties' new lease of September 15, 1989, became effective as of September 1, 1989, and controlled the parties' relationship after August 31, 1989. The Landlord then recalculated its claim to be $4,006.25 through August 31, 1989.

The Debtor did not dispute the calculation of this figure, nor its liability for some of the amount sought for the pass-through of taxes. However, it claimed that the relinquishment of the 8,556 square feet of space, per the 2d Amendment, justified a pro rata reduction in the tax liability. The Landlord countered by contending that the Debtor never actually vacated the entire 8,556 square feet of space referenced in the 2d Amendment, and that the Debtor had officiously utilized additional space in the basement which was not factored into the computation and more than offset any space relinquished. *See* page 130 *supra* (letter of August 25, 1989). The latter contention seems particularly well-taken.

We are not inclined to grant the Debtor any dispensation in this regard, partially because we have eliminated entirely the Landlord's attempt to rescind the rent-credits and because we have measured the space utilized by the Debtor in the basement conservatively. We will therefore allow the Landlord to claim $4,006.25 for its

share of the pass-through for taxes, and allow it a claim in the entire amount of $6,515.00 for use of the basement plus the $4,006.25, or a total amount of $10,621.25.

### F. THE LANDLORD IS NOT ENTITLED TO IMMEDIATE PAYMENTS OF THE $10,621.25, IRRESPECTIVE OF THE PRESENCE OF 11 U.S.C. § 365(d)(3).

■ The final issue remaining is a question of bankruptcy law. The Landlord claims that, pursuant to 11 U.S.C. § 365(d)(3), it is not only entitled to an administrative claim for the $10,621.25 fund due to it, but also that it is entitled to immediate payment of that sum. Section 365(d)(3) of the Code provides as follows:

> (3) The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60–day period. This subsection shall not be deemed to affect the trustee's obligations under the provisions of subsection (b) or (f) of this section. Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under this title.

There is no dispute that, irrespective of the presence of § 365(d)(3), the Landlord's request for administrative status of its claim is justified. Clearly, the Debtor used the Landlord's premises post-petition and the estate was preserved thereby. However, the courts have differed widely in their interpretation of § 365(d)(3) on the point of whether or not it allows a non-residential landlord of real property to always obtain immediate payment of rents. Several courts have unqualifiedly held that landlords are entitled to immediate payment of

rent due and unpaid pursuant to a lease running through the date that a non-residential lease of real estate is assumed, or rejected. *See In re Rare Coin Galleries of America, Inc.,* 72 B.R. 415, 416–18 (D.Mass.1987); *In re Western Monetary Consultants,* 100 B.R. 545, 547 (Bankr.D. Colo.1989); *In re Gillis,* 92 B.R. 461, 470 (Bankr.D.Haw.1988); and *In re Longua,* 58 B.R. 503, 505 (Bankr.W.D.Wis.1986). Other courts have held, equally as firmly, that a landlord making a claim for same will not be paid rents arising from a lease running through the period of lease assumption or rejection, despite the presence of § 365(d)(3), unless and until the bankruptcy court is certain that all administrative claims will be paid. *In re Orvco, Inc.,* 95 B.R. 724, 728 (9th Cir. BAP 1989); *In re Patella,* 102 B.R. 223, 224–26 (Bankr.D.N. M.1989); and *In re Tandem Group, Inc.,* 61 B.R. 738, 742 (Bankr.C.D.Cal.1986).

The most pertinent local case is Judge Fox's decision in *In re Dieckhaus Stationers of King of Prussia, Inc.,* 73 B.R. 969, 973 (Bankr.E.D.Pa.1987). *But see In re Alloy Metal Wire Works, Inc.,* 60 B.R. 21, 22 (Bankr.E.D.Pa.1986) (former Chief Judge Goldhaber holds, without citing § 365(d)(3), that a landlord is not entitled to immediate payment). In *Dieckhaus,* Judge Fox held that, while a landlord's claim for rent pursuant to a lease in the pre-assumption or rejection period was not entitled to super-priority status, the landlord was entitled to have the delinquent rent for the period be paid immediately absent a showing that the estate lacked funds necessary to pay all administrative claims in full and upon the condition that the landlord would be obliged to refund part of its payment if all administrative claims were not paid. 73 B.R. at 973. This position, differing from the rulings in *Orvco, Patella,* and *Tandem* in allocating which party has the burden of proving the estate's financial status, is a middle ground between the two above-referenced lines of cases. *See also In re Granada,* 88 B.R. 369, 375 (Bankr.D.Utah 1988); and *In re United West, Inc.,* 87 B.R. 138, 141 (Bankr.D.Nev.1988) (these cases also state a middle ground: they allow the court to decide the landlord's rights to im-

mediate payment on a case-by-case basis depending upon the estate's economic health).

Our analysis begins by acknowledging the presence of legislative history indicating that, due to the unique demands made by debtors upon their landlords, landlords are entitled to assurance that rent will be timely paid from the time that an order for relief is entered until a lease is assumed or rejected. 130 CONG.REC. 58894–95 (daily ed. June 29, 1984), a passage of which is quoted in full in *Western Monetary, supra,* 100 B.R. at 546–47; and *Gillis, supra,* 92 B.R. at 470. However, we believe that this history addresses only the right of the landlord to full payment during the pertinent period. It does not directly address the issue of the landlord's remedies if the debtor-tenant fails to pay during this period. *See* 2 COLLIER ON BANKRUPTCY, ¶ 365.03, at 365–31 ("The paragraph [§ 365(d)(3)] is silent as to the consequences of a failure to perform."). We further believe that, once the pertinent period has come and gone and the landlord has not received the rentals, a different question is raised than the right of the landlord to receive payments during the pertinent period.

In *Grant Broadcasting, supra,* 71 B.R. at 899–900, we declined a request by the suppliers of programming, the debtor independent television station's lifeline, to immediate payment under their contracts, even as to only programming actually used by the debtor. We did note there, however, that landlords had frequently, but not always, been found entitled to immediate payment of rents. *Id.*

The 1984 Bankruptcy Code amendments which included § 365(d)(3) were added to strengthen the position of landlords. One clear effect, to the great benefit of landlords, was allowing them, in contrast to other potential administrative claimants, *see Grant Broadcasting,* 71 B.R. at 897–99, to obtain the full benefit of their lease contracts in the pertinent period, irrespective of the debtor's use of the property and "not withstanding section 503(b)(1) of this title." As we pointed out in *Grant Broad-*

*casting*, the landlord can invoke 11 U.S.C. § 362(d) and proceed to use state-court remedies to evict the debtor if the debtor fails to make rental payments due under § 365(d)(3). *Id.* at 901. *Accord, Dieckhaus*, 73 B.R. at 974.

We therefore conclude that landlords, having been granted significant dispensations through the 1984 amendments to § 365(d)(3), in addition to amendments to other sections of § 365 at that time, have been provided "with all of the protections that they are due under the Code." *In re Joshua Slocum, Ltd.*, 99 B.R. 261, 266 (Bankr.E.D.Pa.), *aff'd*, C.A. Nos. 89–4277, 89–4278, 89–4279 (E.D. Dec. 21, 1989). We are not inclined to read § 365(d)(3) broadly to provide them any more. We concur, therefore, with *Orvco*, the only appellate court to consider this issue, in its holding that a landlord will not be allowed immediate payment of rentals due under a lease in effect during the period between the bankruptcy filing and rejection or assumption of a lease unless it establishes that there is a likelihood that the debtor will pay all administrative claims in full.

Given this conclusion, we will not order the Debtor to immediately pay the Landlord the $10,261.25 to which it is entitled as an administrative claim, as the Landlord requests. There is no evidence that the Debtor is likely to pay all administrative claims in full. Its predecessor, NYC Shoes, was unable to do so under its confirmed Plan. The Debtor has remained in business, but appears to be limping along, unchecked by an active Creditors' Committee and possibly dissipating whatever assets it has in its efforts to survive.

Other factors weaken the claim of the Landlord. The claim is not for sums due under the relevant lease itself, which is all that § 365(d)(3) addresses. The Debtor paid its monthly rentals of $12,772.58, albeit about 30 days late, each month. The larger portion of the present claim is compensation for use and occupancy of the basement space which is not within the scope of the lease and for which the Debtor is liable on basically a *quantum meruit* theory. *See* pages 130–32 *supra*. The

remainder arises from a prior lease which is incorporated into the present lease, and constitutes payments not demanded, as far as we can ascertain, until after the pertinent period ran.

## G.  CONCLUSION

For all of the reasons set forth herein, we shall grant the Landlord an administrative claim of $10,261.25, but deny its request that we order the Debtor to submit immediate payment of this sum to it.