In re ST. MARY HOSPITAL, Debtor.

Roger B. HISER, Trustee on behalf of St. Mary Hospital, Plaintiff,

v.

NEUMANN MEDICAL CENTER, INC., Defendant.

Bankruptcy No. 88–11421S.
Adv. No. 90–0211S.

United States Bankruptcy Court, E.D. Pennsylvania.

Aug. 1, 1990.

David S. Fishbone, Ciardi, Fishbone & DiDonato, Philadelphia, Pa., for plaintiff Trustee, Roger B. Hiser, on behalf of St. Mary Hosp.

Gary Schildhorn, Adelman Lavine Gold & Levin, Philadelphia, Pa., for Creditors' Committee.

W. Jeffrey Garson, Saul, Ewing, Remick & Saul, Philadelphia, Pa., for defendant Neumann Medical Center, Inc.

James J. O'Connell, Asst. U.S. Trustee, Philadelphia, Pa.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant proceeding presents several disputes concerning the interpretation of a contract, an Asset Purchase Agreement ("the APA") dated October 1, 1988, by which the Defendant in this proceeding, NEUMANN MEDICAL CENTER, INC. ("Neumann"), bought the facility previously operated by ST. MARY HOSPITAL, the Debtor ("the Debtor"), effective on the date of the sale closing, apparently December 31, 1988. In resolving this series of disputes, we consistently resort, whenever possible, to the language of the APA, which we find is a comprehensive document setting forth all aspects of the parties' relationship. Specifically, we find that Neumann is entitled to commissions for *all* collections of "assets not sold" to it in the APA coming due between the closing date and June 30, 1989, but not for an item collected by the Debtor on December 29, 1988. However, finding no breach of the APA by the Debtor, we conclude that the only disputed credit to which Neumann is entitled is the reasonable cost of storage of medical records which the Debtor left behind after settlement. We therefore hold that the Debtor is obligated to credit Neumann with $128,244 out of $147,324 disputed commissions, leaving only $71,726 due to the Debtor prior to allowance of any credits to Neumann, but is only obliged to

allow such credits of $64,090. Therefore, we will enter a net judgment of $7,626 in the Debtor's favor and allow Neumann a future credit of $884.60 for each month that it continues to store the Debtor's records.

## B. PROCEDURAL HISTORY

This is the fifth and hopefully the last of the opinions to be written in this case involving the reorganization of a popular community-based hospital, saved from closure and ultimately sold to Neumann, an entity committed to continuing the Debtor's services, through the combined efforts of several of its admitting physicians, many concerned members of the community, and the services of a Chapter 11 Trustee, ROGER B. HISER, the Plaintiff in this proceeding ("the Trustee"). The ever-expanding history of this Chapter 11 case, filed April 27, 1988, is set forth in our prior reported Opinions reported at 86 B.R. 393 (Bankr.E.D.Pa.1988) (court enjoins hospital closure); 89 B.R. 503 (court refuses to require the Debtor to repay Medicare overpayments to retain Medicare affiliation); 97 B.R. 199 (Bankr.E.D.Pa.1989) (court declines request for an award of attorneys' fees from the estate to counsel for community participants); and 101 B.R. 451 (Bankr.E.D.Pa.1989) (court awards the Trustee certain damages from doctors who removed a clinic from the hospital).[1] The history of this case can be ascertained chiefly from perusal of the first of these Opinions, 86 B.R. at 395–97, and the third, 97 B.R. at 200–02, and will not be repeated here. This proceeding arose after this court, on April 5, 1989, confirmed a Plan of Reorganization submitted jointly by the Trustee and Franciscan Health Services, Inc., the centerpiece of which was the APA under which Neumann agreed to purchase most of the assets of the Debtor for about $5 million.

The instant proceeding, which might be viewed as the tale of a white knight who is attempting to claim his rightful payment or salary guaranteed to him from the village he saved or as a knight who is demanding unjustified ransom from the saved village,

was filed on April 9, 1990, by the Trustee. The Complaint requested Neumann to turn over funds to the Trustee in the amount of $168,861.00, plus interest, representing money collected by Neumann which allegedly belonged to the Debtor's estate.

On June 5, 1990, Neumann answered by not only denying any liability to the Trustee, but asserting five Counterclaims which, if sustained, would entitle it to over $200,000 in damages from the Debtor's estate. The trial was conducted on June 20, 1990. At its outset, the parties greatly reduced our labors by presenting a comprehensive Stipulation which included a summary of all areas in dispute and agreements regarding the mathematics underlying the disputes. Each party presented only an accountant as a witness: Joseph M. Huber ("Huber") for the Trustee, and Brad Barry ("Barry") for Neumann.

On June 21, 1990, subsequent to the trial, we entered an Order according the parties an opportunity to file Proposed Findings of Fact and Conclusions of Law and Briefs on or before July 6, 1990 (the Trustee), and on or before July 20, 1990 (Neumann). The parties complied strictly with this Order. Pursuant to Bankruptcy Rule ("B.Rule") 7052 and Federal Rule of Civil Procedure ("F.R.Civ.P.") 52(a), this decision has been prepared in the form of Finding of Facts and Conclusions of Law including, where necessary, explanatory Discussion.

## C. FINDINGS OF FACT

1. The APA is a detailed, comprehensive 48–page document, excluding numerous exhibits, which was not only drafted carefully by counsel for the parties, but was subject to input from the numerous other parties interested in this case, before we approved it.

2. By the trial date, the parties had confined their disputes as follows:

a. The "starting point" was the figure that the Debtor claimed was due before Neumann was allowed disputed commissions and credits due were deducted, *i.e.*, $199,961.

---

1. This Opinion is cited below as *"St. Mary IV."*

b. It was agreed that Neumann was entitled to commissions, at thirty (30%) percent, on receivables of $1,647,896. However, Neumann's right to commissions on the following four items were in dispute:

(1) June 1989 collections (in his post-trial submissions, the Trustee agrees that Neumann is entitled to same) — $ 77,563.00

(2) Capital and medical education payments from third parties — 123,315.00

(3) Receivables where money was received by St. Mary in pre-agency period (according to Neumann) in violation of paragraph 13 of the APA — 63,598.00

(4) Other receivables (refunds from vendors, income on estate bequests, insurance refunds, return of deposits) — 226,603.00

| Total of Disputed Collections | $491,979 |
| Rate of Commission | .3 |

| | $147,324 (rounded) |

c. It was undisputed that Neumann was entitled to credits of $46,398 for reimbursement of its payment of the salary and office support for an agent of the Debtor on its premises. However, the credits allowable to Neumann for the following items were in dispute:

| Item | Amounts Due per Trustee | Amounts Due per Neumann |
| --- | --- | --- |
| (1) Indemnification to Neumann for certain lawsuits against the Debtor | $ –0– | $ 11,330 |
| (2) Storage of the Debtor's records by Neumann | $13,600 | 118,235 (however, in its post-trial submissions, Neumann reduced this demand to $67,595, plus future "use"). |
| (3) Neumann's right to reimbursement for services to Blue Cross in-house patients of December 31, 1988 | 3,116 | 37,068 |
| Total of Allowable Credits | $16,716 | $105,393 + |

3. Pertinent to the issue of the commissions due to Neumann are the following provisions of the APA:

14. *Collection of Accounts Receivable.* As of the date of the closing Trustee shall designate Buyer as his agent for the collection of all of Debtor's accounts receivable not sold hereunder and shall provide such approvals and procedures as are necessary for Buyer to collect and retain such funds, and Buyer shall be entitled to use such funds for its own purposes, without restriction, in the operation of the Hospital. Buyer shall use reasonable efforts to collect all accounts receivable of Debtor. On June 1, 1989, Buyer shall pay to Trustee 70% of the proceeds received from such accounts receivable (except those accounts receivable arising with respect to patients treated before the date of the Closing and discharged on or after the date of the Closing, which accounts receivable are included in Assets under Section 1(b)(vii) hereof) after deducting from the gross proceeds fees incurred for outside collection agents. On June 1, 1989 Buyer shall render an accounting to Trustee and shall pay Trustee the full amount due. Any accounts remaining uncollected on June 1 shall be returned to Trustee. Buyer, at its option, may make an accounting to Trustee at any time after February 28, 1989, and return all uncollected accounts receivable to Trustee. To secure its obligation to pay Trustee the amounts due under this Section 14, Buyer shall grant to Trustee a security

interest in its own accounts receivable (after adjustment for contractual allowances) and the proceeds thereof up to an amount equal to 105% of the amount owed to Trustee. If Buyer, at any time, sets apart and segregates the amounts due to Trustee under this Section 14 and does not use such funds in the operation of Buyer's business, Trustee shall terminate the security interest on Buyer's accounts receivable granted pursuant to this Section 14.

1(b) "Assets" [purchased] shall mean:

.    .    .    .    .

(vii) Accounts receivable (or the proceeds therefrom) arising with respect to patients treated before the date of the Closing and discharged on or after the date of the Closing . . .

2. *Assets Not Sold.*

There shall not be sold, transferred or assigned pursuant to this Agreement the following assets of the Debtor:

(a) Cash, securities, certificates of deposit and other cash equivalents of Debtor, including gifts, devises, donations or bequests arising from or under an instrument dated prior to Closing.

(b) All claims or causes of action of Debtor arising under the Bankruptcy Code or otherwise except for the accounts receivable and rights and claims sold hereunder.

.    .    .    .    .

(d) All rights and claims against third party payers with respect to rate appeals and with respect to settlements for all cost reports prepared for Debtor for periods ending on or prior to the date of the Closing, including but not limited to any reimbursement of costs attributable to the disposal of the assets of Debtor.

(e) All assets arising from the prepayment of expenses prorated as of the date of the Closing.

.    .    .    .    .

(i) Accounts receivable of debtor except those described in Section 1(b)(vii).

(j) Medical records of patients for all periods ending on or before June 30, 1986.

4. The only provision of the APA directly addressing any of the disputed claims for credits allowable is the following provision relating to the Trustee's obligation to indemnify Neumann in certain respects:

. 18. *Indemnity by Trustee*

(a) Trustee hereby indemnifies Buyer against and holds Buyer harmless of and from, and shall be liable for any and all demands, claims, losses, expenses, damages, deficiencies and liabilities of any kind or description made against or incurred by Buyer (including reasonable attorneys fees and other costs and expenses incident to any suit, action or proceeding or any investigation with respect thereto) resulting at any time after the date of this Agreement by reason of;

(i) any misrepresentation, breach of warranty or nonfulfillment of any covenant or agreement on the part of Trustee contained in this Agreement or any exhibit hereto,

(ii) any nonpayment of any obligations or liabilities of Debtor not expressly assumed herein by Buyer, (however, Buyer shall defend, without waiver of its rights under Section 18, or allow Trustee to defend such claims),

(iii) any claim, action or judgment against Buyer of any nature or description arising from or in connection with any of the Business of Debtor at any time prior to the date of this Agreement, and

(iv) any stay, vacation, rescission, modification or other variation, in whole or in part, either temporarily or permanently, of the Sale Approval Order unless caused by the action or inaction of Buyer.

5. There are no provisions in the APA which address Neumann's claims for storage of medical records or reimbursement for expenses incurred on behalf of the three patients left in the hospital by the Debtor at the time Neumann took over its operations. Neumann argues that the

Debtor's leaving its records behind and obliging it to store them violated a provision of the APA requiring the Trustee to deliver the hospital real estate to Neumann free from encumbrances. Neumann also contends that the Debtor's leaving behind the three patients violated a term of its Blue Cross provider agreement and hence violated an APA provision relating to the representations and warranties of the Trustee which reads as follows:

8(d) *Agreement Does Not Violate Other Agreements.*

Neither the execution and delivery of this Agreement nor compliance with the terms and conditions of this Agreement by Trustee or Debtor will breach or conflict with any other terms, conditions or provisions of any agreement or instrument (including, without limitation, Medicare and Medicaid Assistance provider agreements) to which Trustee or Debtor is a party or by which Trustee or Debtor is or may be bound or constitute a default thereunder or result in a termination of any such agreement or instrument.

6. The Debtor agrees that it is liable to Neumann in some amount for storage of the medical records. It contends that the figure should be $800 per month, a figure allegedly discussed between the parties prior to the outbreak of the instant disputes, but never agreed upon. The Trustee contends that this sum is supported by Neumann's own proposal received from Pierce Business Archives ("Pierce") to store the records for $9,823.44 annually.

7. Neumann originally supported its claim of $118,235 for storage by measuring its annual cost of maintenance per square foot of the entire hospital facility, and then multiplying this figure by the square footage consumed by the records. Upon apparently acknowledging that the space consumed by the records is among the "least valuable" in the facility, it points out that the Trustee misread Pierce's proposal by omitting the additional charges for storing certain pathology slides and that the entire annual storage cost of the Debtor's records recited by Pierce was $10,615, a monthly rate of $884.60. In addition, although there was no evidence that Neumann's employees were obliged to or in fact had retrieved information therefrom, Neumann contended that the rental figure should be supplemented by charges for retrieval as measured by Pierce and by a proposal from Deliverex, which would place the charges at $2,976.50 per month, or $67,595 to date.

8. Neumann contends that the $63,598 receivable referenced in Finding of Fact 2b(3), page 128 *supra*, should be credited to it because paragraph 13 of the APA required the Trustee to conduct the Debtor's business "in the usual and normal course" throughout the period between the execution of the APA and closing, and this receivable related to a check received from the Commonwealth of Pennsylvania, Department of Public Welfare ("DPW") for services which the Debtor obtained by sending an employee to Harrisburg to pick it up rather than waiting to receive it in the mail, as it had done in its usual and normal course of business in the past, and would have resulted in its receipt in the period in which commissions were applicable.

9. Of the costs in litigation for which Neumann sought reimbursement, although Barry testified that about $7,700 was for counsel fees in actions which the Debtor or its insurers ultimately defended, and the balance was for the time expended by a "risk manager" and secretaries in connection with retrieval of records relative to these actions. However, no specific cases were referenced, nor any time-records were produced, at the trial.

10. Neumann similarly presented no specific itemization of the costs incurred in caring for the three patients left behind in the facility by the Debtor. Barry explained that the costs were not in fact reimbursed by Blue Cross, as per the Debtor's calculations of amounts that it agreed to pay and as they had been during the patients' stays in the facility under the Debtor's tutelage, because Neumann had not yet qualified as a Blue Cross provider. Although Neumann, in its post-trial submissions, suggests that the Debtor should have arranged to move these patients to another

facility covered by Blue Cross, Barry admitted that Neumann had never asked the Debtor to move them and instead tried unsuccessfully to get Blue Cross to reimburse Neumann at the rate applicable to the Debtor.

11. Barry testified that, in his 15 years as an accountant, the term "accounts receivable" was used to mean sums payable to a party from all sources, therefore embracing amounts paid to the Debtor for "capital and medical education" purposes, as well as payments on patient accounts. Thus, he concluded that Neumann was entitled to payments for sums received by Neumann for the Debtor from third-party payors. The Trustee, meanwhile, emphasized that Huber, also an experienced accountant, testified that he believed that, since accounts payable by "third-party payers," as per paragraphs (1)(b)(vii) and 2(d) of the APA, see page 129 *supra,* were not sold to Neumann, only collection of patient accounts were subject to commissions. Therefore, the Trustee concluded that payments received by Neumann from third-party payors on the Debtor's behalf should not be bases for commissions.

D. CONCLUSIONS OF LAW/DISCUSSION

   1. THIS COURT HAS JURISDICTION TO HEAR AND DETERMINE THIS MATTER.

■ In his Complaint, the Trustee alleges, and Neumann admits without qualification, that "[t]his court has jurisdiction ... pursuant to 28 U.S.C. Section 157(2)(E)." Though inartfully [2] stated, this is apparently meant to be an allegation that the instant matter is core in nature. An admission that a proceeding is core accords irrevocable consent to a bankruptcy court to determine the proceeding, even if it is non-core. *See* 28 U.S.C. § 157(c)(2); B.Rule 7012(b); and *St. Mary IV, supra,* 101 B.R. at 458.

■ Independently from these allegations and admissions, we observe that this

proceeding is core under 28 U.S.C. § 157(b)(2)(A) because it clearly relates to a cause of action which arose in the course of post-petition administration of the Debtor's case. *See In re Ben Cooper, Inc.,* 896 F.2d 1394, 1397–1400 (2d Cir.1990); *In re Arnold Print Works, Inc.,* 815 F.2d 165, 168–71 (1st Cir.1987); *Valley Forge Plaza Associates v. Firemen's Fund Ins. Cos.,* 107 B.R. 514, 516–18 (Bankr.E.D.Pa.1989); *In re 222 Liberty Associates,* 110 B.R. 196, 199–200 (Bankr.E.D.Pa.1990); and *In re Jackson,* 90 B.R. 126, 129–30 (Bankr.E.D. Pa.1988). We will therefore proceed to determine it.

   2. NEUMANN IS ENTITLED TO COMMISSIONS ON ALL BUT THE SUM RECEIVED BY THE DEBTOR PRIOR TO CLOSING, *I.E.,* $128,244.

Since it is a comprehensive document carefully negotiated and drafted by competent counsel on all sides, the APA must control all aspects of the relationship of the parties which it addresses. Since it must be assumed that it covered all aspects of the parties' relationship, charges for matters omitted from it should not be lightly appended. It is agreed that the only relevant subsequent modification to the APA was setting back the June 1, 1989, date in ¶ 14, see page 128 *supra,* for which commissions were payable to June 30, 1989. Therefore, by force of a rule of substantive law, *i.e.,* the parol evidence rule, the parties are precluded from arguing that any other terms inconsistent with the terms of the APA are valid. *See, e.g., Globe Motors, Inc. v. Studebaker–Packard Corp.,* 328 F.2d 645, 649 (3d Cir.1964); *In re Frymire,* 96 B.R. 525, 535 (Bankr.E.D.Pa.), *vacated in part on other grounds & aff'd in part sub nom. Frymire v. Painewebber, Inc.,* 107 B.R. 506 (E.D.Pa.1989); and *Scott v. Bryn Mawr Arms, Inc.,* 454 Pa. 304, 307–08, 312 A.2d 592, 594 (1973).

■ Our goal is therefore to interpret the APA as it is written, not in the way

---

**2.** 28 U.S.C. § 157 does not technically reference jurisdiction, which is covered by 28 U.S.C. § 1334(b). Rather, it pertains to the procedures to be used by a bankruptcy court in deciding a

proceeding before it, more precisely whether a proceeding is core or non-core or there is some extraordinary basis for declining to hear the matter.

that it might have been written had counsel been clairvoyant to have envisioned the instant controversies. An unambiguous contract must be interpreted as it is written, even if the parties meant or interpreted it differently. *See St. Mary IV, supra,* 101 B.R. at 461. It is only when a contract term is ambiguous, the ascertainment of which is itself a matter of fact, that a court may inquire beyond a contract's four corners into the intent of the parties who entered into it. *See In re Valley Forge Plaza Associates,* 113 B.R. 892, 899, 900 (Bankr.E.D.Pa.1990).

The terms of paragraph 14 of the APA, quoted at pages 128–29 *supra,* are, for the most part, clear. Neumann is entitled to its thirty (30%) percent commission on collection of *all* accounts receivable during the pertinent period, *i.e.,* December 31, 1988, to (as modified) June 30, 1989.

■ There is potential ambiguity in the meaning of the term "accounts receivable." However, the testimony of Barry, which was found convincing, resolves this ambiguity in favor of a broad reading of that term. As Neumann points out in its submission, the reasoning of Huber and the Trustee on this point, *see* page 131 *supra,* was confused and erroneous. It is true, as Huber points out, that the payments referenced in ¶ 2(d) of the APA are identified as "assets not sold" in the APA. However, it is *only* collections from "assets not sold" on which commissions *are* collectible. Assets *sold* belong to Neumann, and no commissions would be payable to Neumann to collect such amounts. Thus, it is clear that the disputed capital and medical education payments receivables were "assets not sold" and therefore were *not* eliminated from the group of receivables to which Neumann's right to commissions applies.

We are similarly unconvinced by the Trustee's implicit contention that the APA requires that we must engage in an analysis of the intensity or difficulty of Neumann's collection activities to determine whether certain collections are susceptible to commissions. The APA, on its face, entitles Neumann to commissions on all receivables, without regard to its efforts expended in making these collections. Requiring Neumann to prove such efforts would therefore significantly alter the parties' agreement. We also note that the Trustee has in no sense quantified his contention regarding the absence of labors actually expended by Neumann on collection activities. He merely states that some collections required Neumann to only forward mail to the Trustee. In how many instances this was allegedly true, we can only guess.

However, we find that the principle that the contract must be enforced as written precludes Neumann from claiming commissions as to the receivable of $63,598 collected by the Debtor itself from DPW just prior to the closing. This payment, though a receivable, was clearly not made in the period in which commissions were collective by Neumann.

Neumann's argument that, in the ordinary course of the Debtor's business, this payment would have been made later, in the "commission period," is unavailing. There is no direct connection between paragraph 13, regarding conduct of business, and the subsequent paragraph 14. Therefore, we refuse to read paragraph 13 as requiring the Debtor to conduct its collection of accounts receivable within the "gap" period between the execution of the APA and the closing precisely as it had before. Rather, we believe that it was totally natural and hardly unexpected by either party that the Trustee would make every effort to collect any receivable he could before the payment of commissions to Neumann for these collections began. Therefore, the Trustee should not be penalized for such activities.

The Trustee has already conceded that Neumann is entitled to commissions for the June, 1989, collections. Therefore, Neumann is entitled to commissions as to the items referenced in Finding of Fact 2b(1), (2), and (4), but not that referenced in 2b(3). *See* page 128 *supra.* Neumann is hence entitled to additional commissions on a gross sum of $427,481.00, thirty (30%) percent of which is $128,244.30. We will

round this figure off to $128,244 in our calculations.

3. NEUMANN IS ENTITLED TO DISPUTED CREDIT OF ONLY $17,692 THROUGH AUGUST, 1990, OR A TOTAL OF CREDITS OF $64,090.

We begin our discussion of Neumann's allowable credits by beginning with the claim of Neumann for its losses incurred by its care for the three patients left in the facility by the Debtor after the closing. As in our previous discussion, we are forced to begin with the observation that, although the issue of how such problems were to be handled could have been addressed by the APA, it was not. Therefore, a presumption arises that Neumann cannot be reimbursed for its actions on behalf of these patients.

We are not convinced by Neumann's creative but rather far-fetched attempt to argue that the Debtor's conduct in leaving the patients there violated the Debtor's Blue Cross contract, thus entitling Neumann to damages measured by its cost of care, for several reasons. Firstly, ¶ 8d of the APA, quoted at page 130 *supra*, specifically mentions the Debtor's obligation to adhere to its Medicaid and Medicare provider agreements, but does not specifically reference its agreements with Blue Cross. Secondly, the Debtor's Blue Cross provider agreement is not itself in the record, and we are unable to ascertain precisely how and in what manner the Debtor is alleged to have violated that agreement. Thirdly, Neumann itself took no action to transfer the patients, or, apparently, to even ask the Debtor to transfer the patients to another facility. Rather, its initial response was apparently to urge Blue Cross to reimburse it for these patients. We have no hard evidence of the response of Blue Cross to this request, and we have no evidence as to whether an appeal or some such action to obtain recovery of Blue Cross benefits would have been feasible or is pending. ▮ While the APA is silent on the issue, the Debtor recognizes that, in good conscience, Neumann is entitled to the amounts which the Debtor itself was reimbursed by Blue Cross for treating these patients. Neumann is to be commended for its proper concern with treatment of these patients first and resolution of its rights to reimbursement for their treatment second. However, this fact does not render the Debtor liable, under the APA or otherwise, for Neumann's losses due to its voluntary humanitarian acts. Despite the equities of Neumann's position, the APA does not authorize our imposing this obligation upon the Trustee. *Compare St. Mary, IV*, 101 B.R. at 460–61 (equities are unavailing in modifying the terms of an unambiguous contract).

▮ The second disputed element involves Neumann's claim for indemnification for its alleged legal expenses and other costs incurred in defending certain lawsuits which were aimed at challenging alleged lack of delivery of proper care to patients by the Debtor. This claim has at least some basis in the APA, as it allegedly arises under the terms of ¶ 18 thereof, quoted at page 129 *supra*.

However, we begin by observing that the language of ¶ 18 is rather narrow, limiting Neumann's right to indemnification in only four specific kinds of events. The only kind of event which appears possibly applicable is that identified in ¶ 18(a)(iii). However, that sort of event requires that a claim, action, or judgment must be brought against Neumann itself. Given the very general description of the legal actions in which expenditures for which indemnification is sought, we cannot tell whether all or some of the lawsuits fit within this narrow definition, despite Barry's general statement that Neumann was sued itself in at least one of these lawsuits.

Furthermore, it must be recalled that the claims here are in the nature of a "pass-through" to the Debtor of legal expenses and costs allegedly incurred by Neumann. We have traditionally been very demanding of specificity from a party who seeks to pass through legal expenses and costs to another party. Thus, in *In re Joshua Slocum, Ltd.*, 103 B.R. 601, 607–07 (Bankr.E. D.Pa.1989), we declined the request of a landlord making demand under 11 U.S.C. § 365(b)(1) for attorneys' fees because of

the absence of proof by the landlord of clear contractual authority for the pass-throughs and the absence of "detail of the services performed, time expended, and hourly rates of counsel, akin to that required under the standards in *In re Meade Land & Development Co., Inc.*, 527 F.2d 280 (3d Cir.1975)." *Id.* at 608. *See also, e.g., In re Fricker,* 115 B.R. 809, 825–26 (Bankr.E.D.Pa.1990); and *In re Orsa Associates, Inc.,* 106 B.R. 418, 423–27 (Bankr.E.D.Pa.1989).

Clearly, no itemization of attorneys' services in the fashion of *Meade Land,* or documentation of costs in the fashion of *In re Mayflower Associates,* 78 B.R. 41, 47–48 (Bankr.E.D.Pa.1987), was provided as to the claims in issue by Neumann. In fact, no written itemizations or affidavits by counsel of any sort were prepared, nor were any copies of receipts to support expenditures presented. The sums demanded by Neumann were supported only by the oral testimony of non-attorney Barry. Consequently, we will not allow a credit to Neumann for indemnification for such costs and services.

■ The final issue is Neumann's claim for costs for storing the Debtor's medical records. We begin by noting that the APA is silent on this subject. However, as we indicated to the parties, we find an analogy between the facts of this claim and those at issue in *In re Orient River Investments, Inc.,* 112 B.R. 126, 130–32 (Bankr.E.D.Pa.1990). In that case, a debtor was held liable to a landlord for reasonable rentals when it officiously utilized certain portions of the realty adjacent to its rented space for storage.

In one respect, this claim of Neumann is weaker than the comparable claim of the landlord in *Orient River.* The status of the Debtor here is quite arguably that of a trespasser who attempts to utilize the real property of another without color of right. Such a party is subject to eviction, but, lacking any contractual relationship with the property owner, cannot be liable to the owner for rent. *Id.* at 131. Neumann's claim here is for rent, not for an order requiring the Debtor's removal of the records.

However, there is evidence that the parties discussed the presence of the Debtor's records in the facility, and, for a period well after such discussions, the Trustee was aware of Neumann's claims for compensation for the storage. Negotiations concerning a specific rent payment to be made to Neumann for the storage took place. For this reason, the Trustee could not successfully maintain and wisely does not argue that Neumann is not entitled to some compensation for the storage. However, he argues that the compensation should be limited to the $800 per month figure proposed by the Trustee during the parties' negotiations.

The Trustee did not, however, prove that there was any agreement regarding the $800 figure. A tenant is not entitled to unilaterally determine his own rent. Therefore, a wide but decreasing range of figures beyond that proposed by the Trustee has been claimed by Neumann. Originally, Neumann claimed over $118,000, measured by computing the value of its entire facility per square foot and multiplying that figure by the square footage in the facility consumed by the Debtor's records.

As Neumann now apparently recognizes, this measure of damages was excessive. The space in Neumann's facility is not fungible. We must assume, given Neumann's control over them, that the records are stored in space in the facility not already filled with more important devices or items. If in fact the space of the facility were insufficient to contain the records, Neumann doubtless would have removed them to storage space, even at its own cost. The expense of such alternative storage space is hence the legal maximum measure of the "rent" to which Neumann is entitled for storing these records. We note that this measure is consistent with the principle of restitution that its measure "is limited to what the services are reasonably worth *in view of the purposes of the recipient,*" RESTATEMENT OF RESTITUTION, § 40, comment *f,* at 761 (1937) (emphasis added), not in view of their potential value to the giver.

The Debtor suggests that the annual charges which would have been imposed by Pierce, a professional storage company, should be the measure of the rental. In its submission, Neumann appears to agree, although it argues convincingly that the Trustee overlooked Pierce's additional figures for storing its pathology slides and, less convincingly, that the Debtor overlooked the propriety of adding costs for services to retrieve the records. We believe that Neumann is correct in its assertion that the Trustee misread the Pierce figures. However, we can perceive no basis on which to impose retrieval-services costs upon the Trustee. There is no evidence that Neumann has performed or will be requested to perform any retrieval services on behalf of the Debtor in reference to the records.

We conclude that the accurate interpretation of Pierce's figures is that its annual charge to store the Debtor's records and pathology slides would have been $10,615, or $884.60 per month. Over the 20–month period from January, 1989, through August, 1990, the sum chargeable to the Trustee calculates to $17,692. That sum, plus $884.60 for each month after August, 1990, that the records remain at Neumann's facility, is determined to be the appropriate charge to the Trustee for the use of the space.

The Trustee agrees that Neumann is entitled to credits of $46,398 for payment of the salary, office space, and related support services to the Debtor's agent at the facility. The total of the credits to which Neumann is entitled is therefore $46,398 plus $17,692 or $64,090, plus $884.60 for storage rent in each month after August, 1990, that the Debtor's records remain at Neumann's facility.

E. CONCLUSION: THE TRUSTEE IS ENTITLED TO A JUDGMENT IN HIS FAVOR IN THE AMOUNT OF $7,627, ALTHOUGH HE IS ALSO LIABLE TO NEUMANN FOR STORAGE OF THE DEBTOR'S MEDICAL RECORDS IN THE FUTURE.

Among the stipulations of the parties are that the Trustee was due to receive $199,- 961, less the commissions due to Neumann which had not been paid to it, less the other credits to which Neumann was entitled. We now compute the accounting between the parties as follows:

| | |
|---|---|
| Gross amount claimed by Trustee | $199,961 |
| (Less) Commissions due to Neumann | ( 128,244) |
| (Less) Credits payable to Neumann | ( 64,090) |
| Balance Due to Trustee | $ 7,627 (less future costs to store the Debtor's medical records) |

We will enter an Order awarding a judgment for the Trustee in this amount and entering judgment for the Trustee on Neumann's Counterclaim except as to the charges to store the Debtor's medical records in the future.