**In re MR. GATTI'S, INC., Debtor.**

**Bankruptcy No. 91–13460–LK.**

United States Bankruptcy Court,
W.D. Texas,
Austin Division.

March 2, 1994.

Adrian M. Overstreet, Austin, TX, for Mr. Gatti's Inc.

Angela Dickerson, Dallas, TX, for Centennial Mortgage Corp.

### MEMORANDUM OPINION ON MOTION OF CENTENNIAL MORTGAGE CORP. FOR ALLOWANCE OF PRIORITY EXPENSE

LARRY E. KELLY, Chief Judge.

### I. INTRODUCTION

This case raises questions of first impression in this court regarding the interpreta-

tion of 11 U.S.C. § 365(d)(3). The Debtor, Mr. Gatti's, Inc., objects to the Motion For Allowance of Administrative Priority Expense filed by Centennial Mortgage Corp. ("Centennial"). Centennial seeks to obtain an administrative claim for unpaid rent on a lease of real property, when the property was not used by the Debtor post-petition and where the lease .has been rejected in this bankruptcy proceeding.

## II. JURISDICTION

This is a contested matter over which the court has jurisdiction under 28 U.S.C. § 1334(a) and (b), 28 U.S.C. § 151 and the standing order of reference in this district. It is also a core proceeding under 28 U.S.C. § 157(b)(2)(B) as it deals with the determination of an alleged administrative expense claim against the Debtor's estate. This memorandum opinion shall constitute the court's Findings of Fact and Conclusions of Law under Federal Rules of Bankruptcy Procedure 9014 and 7052.

## III. STATEMENT OF FACTS

The facts are substantially uncontroverted. Mr. Gatti's, Inc. is a national franchisor of pizza restaurants. It filed a Chapter 11 bankruptcy case on October 10, 1991. Previous to that, on November 15, 1983, the Debtor, as lessee, entered into a lease agreement with Corum–Humble Shopping Center, Ltd., as lessor, to rent certain commercial space in Humble, Texas. On August 24, 1987 the Debtor subleased the premises to Corum–Humble Pizza, Inc. ("C–H Pizza"), one of its franchisees. On September 29, 1988, Centennial acquired title to the shopping center in which the leasehold premises were located.

Immediately prior to the Debtor's bankruptcy, sub-lessee C–H Pizza gave written notice to Centennial's property manager that it was ceasing its business operations, removing its equipment, and would have the leasehold premises cleaned up by October 2, 1991. Centennial immediately gave written notice that C–H Pizza's "abandonment of the leased premises constitute events of default [under terms of the lease]" and "without waiving any of its continuing rights under the lease and without terminating the lease, *the landlord hereby terminates your right to posses-*

*sion of the leased premises* so that it may attempt to relet the premises in your behalf." (Centennial Exhibit No. 9) (emphasis added).

The parties at trial agreed that C–H Pizza had effectively vacated the leased premises by October 14, 1991 or four days after this bankruptcy petition was filed. Centennial has separately filed a Proof of Claim for damages for lease rejection and this Motion For Allowance of An Administrative Claim for rent accrued during the post-petition period. The locks were changed by Centennial's agents immediately and at no time post-petition did the Debtor ever enter onto or make any actual use of the leasehold premises. The Debtor had approximately 125 other similar leases which it was evaluating at the time it filed for bankruptcy. It sought and obtained an extension of the statutory sixty-day period of time allowed under Section 365(d)(4) in which to assume or reject its leases, including this lease. An agreed motion was later filed by these parties seeking to reject this lease, which was approved by court order on April 21, 1992. Centennial then timely filed this administrative claim in the amount of $33,062.68 calculated from the date of the bankruptcy filing through the date of the order approving rejection.

Mr. Woody Mann, Jr., who was with the real estate management company that acted as Centennial's agent for rental of this property, testified that the contracted rental rate in the lease was $1.43 per foot per month while the actual fair market rate for similar property at this location for all time periods at issue ranged between $.75 and $1.00 per foot per month. The premises were actively marketed after default and a new lease was ultimately signed with a new tenant on or about August 19, 1992, with the lease term of five years at $1.00 per foot per month, plus a percentage rental, common area maintenance and various miscellaneous charges similar to the terms of the present lease.

Notwithstanding the fact that it had been locked out, the Debtor did not dispute that Centennial is entitled to four days of actual use and occupancy, although neither side made any effort to calculate the amount which would be owed under the terms of the lease for such time period. Centennial claims that it is entitled to administrative rent for the entire post-petition period prior

to rejection while the Debtor believes that Centennial is entitled to administrative rent for only these four days. Although there was some bickering over its calculation, the court finds that if Centennial is entitled to recover for the entire post-petition period through date of rejection, it would be entitled to the sum of $33,062.68. The court also finds that the contract rate, on a daily basis for the four-day period, would aggregate $722.68. It is undisputed that the Debtor has made no post-petition payments, in any amount, to Centennial.

## IV. ISSUE PRESENTED

Is Centennial entitled to recover all of the payments called for in the lease as an administrative claim, notwithstanding that no use, occupancy, or benefit accrued to the estate?

Section 365(d)(3) [1] expressly deals with the performance obligations of a debtor under a nonresidential real property lease. This section also applies to trustees and reference to one or the other may be made interchangeably throughout this opinion. While this section expressly requires a debtor-tenant to timely perform all obligations accruing under the lease after commencement of the case, it fails to set out the landlord's remedies in the event of a default. Confusion over the consequences of noncompliance has resulted as courts try to construe this provision.

Indisputably, the goal of statutory construction is to ascertain legislative intent through the plain language of a statute—without looking to legislative history or other extraneous sources. *Caminetti v. United States*, 242 U.S. 470, 490, 37 S.Ct. 192, 195, 61 L.Ed. 442 (1917). The court may not look beyond the words of a statute if those words are rational and unambiguous. *In re Hammers*, 988 F.2d 32, 34 (5th Cir.1973). In this case, the words contained in Section 365(d)(3) are rational enough, but they are ambiguous when it comes to deciding what remedy to apply when they are not complied with. This ambiguity is evidenced not merely by its being the subject of disagreement between these self-interested litigants, but also by the large number of reported decisions by trial and appellate courts that have struggled with its meaning. In order to reach a decision in this case, it is necessary to make a review of the law as it related to this issue before enactment of Section 365(d)(3), and then to analyze the different approaches followed by the courts since its enactment.

## V. HISTORICAL BACKGROUND TO ENACTMENT OF SECTION 365(d)(3)

Prior to the adoption of the Bankruptcy Code of 1978, the bankruptcy of a tenant was

1. All statutory provisions discussed herein, unless otherwise noted, are found in Title 11 of the United States Code. Section 365(d)(1–4) provides:

(d)(1) In a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such contract or lease is deemed rejected.

(2) In a case under chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor at any time before the confirmation of a plan but the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such a contract or lease.

(3) The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the

order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60–day period. This subsection shall not be deemed to affect the trustee's obligations under the provisions of subsection (b) or (f) of this section. Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under this title.

(4) Notwithstanding paragraphs (1) and (2), in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

not generally of major concern to lessors of commercial property. Lessors simply made frequent use of "ipso facto" clauses. These clauses permitted lessors to regain control of leased premises and were enforceable in bankruptcy. See, Bankruptcy Act of 1898, § 70(b), former 11 U.S.C. § 110(b), repealed by the Bankruptcy Reform Act of 1978. With the enactment of the 1978 Code, however, leases automatically became property of the estate, ipso facto clauses were no longer enforceable and lessors were no longer able to immediately regain control of the lease property in the event of bankruptcy. Although protections were incorporated into the Code for the lessor's benefit, especially regarding assumption and assignment of commercial leases, many lessors felt that these protections were inadequate. Three principal problems were generally cited. First, the Code allowed for extensive delays in the assumption or rejection of the lease. Only Chapter 7 had a time period for automatic rejection when assumption was not timely made. Second, trustees were not required to fully comply with all the terms of the lease during their period of decision. Prior to the 1984 amendments, section 365 provided that if a lease was assumed, the estate would be liable for the rent fixed in the lease. However, if the lease was ultimately rejected, the estate was liable only for the period of actual use and only to the extent of real benefit received by the estate. Without assumption, courts could then order a sum to be paid which was lower than the contract rate. Third, lessors complained that assignment of leases could be allowed in violation of specifically negotiated lease provisions. The 1978 Code originally permitted the bankruptcy courts discretion to approve assignments so long as the restrictive provisions in the lease were not "substantially" breached. Of course, the reciprocal of this provision means they could be breached to a degree and the degree was to be determined by the court. Lessors were then compelled to expend time and money in order to try to limit these unintended consequences. 2 Collier on Bankruptcy, ¶ 365.03[3] at 33, 32 (5th ed. 1988).

These complaints ultimately lead to changes in the 1978 Code, incorporated with the adoption of the 1984 amendments. A strict time limit on the ability of a trustee to assume or reject a lease for nonresidential real property was imposed to satisfy the first concern. This limitation also shifted the burden to the debtor to assume or to seek an extension of the time allowed if more time was needed. 11 U.S.C. § 365(d)(4). To address the second concern, an amendment was enacted requiring the debtor to fully and promptly perform all lease obligations during the time the decision of whether to assume or reject was being made. 11 U.S.C. § 365(d)(3). To help remedy the third concern Congress modified the provisions relating to assumption and assignment. Section 365(b)(3)(C) & (D) were amended to delete the word "substantially" from the provisions requiring that assignment of a shopping center lease not violate use restrictions or disrupt tenant mix. Bankruptcy courts no longer had the discretion to create new leases by changing lease terms to make assignments easier.

It is the second concern and Congress' effort to address it that is at issue in this case. There is no real doubt that Congress intended to enhance protections for lessors. Senator Hatch, a key sponsor of the legislation, responding to the three primary criticisms of lessors, summarized the intended effect of Section 365(d)(3) as follows:

> The bill will lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property at the time required in the lease. This timely performance requirement will insure that the debtor-tenants pay their rent, common area and other charges on time, pending the trustee's assumption or rejection of the lease. For cause, the court can extend the time for performance of obligations due during the first 60 days after the order for relief, but not beyond the end of such 60-day period. At the end of this period, the amounts due during the first 60 days would be required to be paid, and thereafter, all obligations must be performed on time. This permissible 60-day grace period is intended to give the trustee time to determine what lease obligations the debtor has and to locate the cash to make the required payments in exceptionally large or complicated cases.

130 Cong.Rec. S8891, 599 (1984) (statement by Sen. Hatch).

As straightforward as newly added Section 365(d)(3) was regarding the obligation of the debtor-tenant to fully and timely perform, it was wholly lacking with regard to any expression of the remedies available to the lessor in the event of a default. If the lease was assumed, the estate would again have to cure and therefore pay in accordance with the lease terms all of the rent and other obligations. 11 U.S.C. § 365(b)(1). When it is rejected, however, a number of different issues have arisen and been debated. These concerns focus on whether or not the debtor loses the ability to seek an extension of the time in which to assume or reject,[2] whether the lessor's claim for the post-petition period is an administrative claim and if so, whether it might even be a superpriority claim, what "obligations" are post-petition obligations which have to be paid in full as opposed to being considered part of the pre-petition unsecured claim when the lease is rejected;[3] and exactly when is it that rejection occurs.[4]

## VI. CASE LAW TREATMENT OF A LESSOR'S POST-PETITION, PRE-REJECTION CLAIM

The most fundamental issue encountered by the courts where a lease is rejected and the debtor has failed to meet all of its post-petition lease obligations as in this case, concerns the treatment of the lessor's claim. The scenario involves the lessor seeking to recover payments for the 60-day period as an administrative expense or through some priority payment scheme. Courts are especially in disagreement over the proper treatment of the lessor's post-petition, pre-rejection claim, where the estate has in no way benefitted through any actual use.

### A. TREATMENT PRIOR TO SECTION 365(d)(3)

Prior to the 1984 amendments, the bankruptcy estate's liability for unpaid rent was

2. The court may, for cause, extend the time for decision in § 365(d)(4). But, what if the debtor is not in compliance with § 365(d)(3). In *In re Condominium Administrative Services*, 55 B.R. 792 (Bankr.M.D.Fla.1985), it was held that compliance with § 365(d)(3) was mandatory before a debtor could assume a lease. Presumably, the failure of a debtor to comply would cause a motion to extend the time to also be denied. See also, *In re Tandem Group, Inc.*, 60 B.R. 125 (Bankr.C.D.Cal.1986). ("This court may not grant the extension unless the debtor pays all post-petition rent due under the lease.") However, the majority of opinions have not held that a violation of § 365(d)(3) is determinative per se. See *In re Southwest Aircraft Services, Inc.*, 831 F.2d 848, 854 (9th Cir.1987) ("We believe that Congress intended the bankruptcy courts to have the discretion to consider all of the particular facts and circumstances involved in each bankruptcy case and to decide whether the consequence of a violation of subsection (d)(3) should be forfeiture of the unassumed lease, some other penalty, *or no penalty at all.* Accordingly we hold that the failure to make payments under subsection (d)(3) constitutes simply one element to be considered, along with all the other relevant factors, in determining whether cause exists under subsection (d)(4) to extend the 60-day period for assumption or rejection." (emphasis added))

3. Since Congress chose to use the word "obligations" rather than the defined word "claim", courts have varied in their determinations of exactly what is required to be paid post-petition

to constitute compliance with § 365(d)(3). See, e.g., *In re Ames Department Store, Inc.*, 150 B.R. 107 (Bankr.S.D.N.Y.1993) (pro-rate ad valorem taxes); *In re R.H. Macy & Co., Inc.*, 152 B.R. 869 (Bankr.S.D.N.Y.1993) (pre-petition and post-petition ad valorem taxes to be paid); *In re Atlantic Container Corp.*, 133 B.R. 980 (Bankr.N.D.Ill. 1991) (repair costs included; *In re Pacific Sea Farms*, 134 B.R. 11 (Bankr.D.Haw.1991) (reasonable attorney's fees of lessor allowed); *In re Orient River Investments, Inc.*, 112 B.R. 126 (Bankr.E.D.Pa.1990) (lessor not entitled to effect in forfeiture of rents credits merely because debtor late in making post-petition payment of rent); *In re Food City, Inc.*, 95 B.R. 451 (Bankr. W.D.Tex.1988) (lessor not entitled to $250,000 fee against debtor-tenant for tenants "ceasing to do business", as such not within scope of obligations covered under § 365(d)(3)).

4. One line of cases holds that rejection is effective without the actual necessity of a court order, while the other view is that it is the court order which effectuates rejection. Compare, *In re Joseph C. Spiess Co.*, 145 B.R. 597 (Bankr.N.D.Ill. 1992) (Any act which clearly and unambiguously communicates to a lessor the debtor's intention to reject an unexpired lease is sufficient to terminate the period for which that lessor can claim administrative rent pursuant to § 365(d)(3), even through court approval of the rejection comes at a later date); with *In re Appliance Store, Inc.*, 148 B.R. 226 (Bankr.W.D.Pa.1992) (Approval of the trustee's decision to assume or reject is not effective until date of the court order.)

limited to the reasonable value to the estate of the actual occupancy and use of the premises. *In re Braniff Airways, Inc.,* 783 F.2d 1283 (5th Cir.1986). This claim for use and occupancy was given administrative status and was therefore sometimes known as administrative rent. *Braniff,* 783 F.2d at 1286. See also *Philadelphia Co. v. Dipple,* 312 U.S. 656, 61 S.Ct. 538, 85 L.Ed. 651 (1941) affirming 111 F.2d 932 (3rd Cir.1940); *Crook v. Zorn,* 100 F.2d 792 (5th Cir.1939), cert. denied 307 U.S. 630, 59 S.Ct. 833, 83 L.Ed. 1513 (1939); *Palmer v. Palmer,* 104 F.2d 161 (2nd Cir.1939), cert. denied 308 U.S. 590, 60 S.Ct. 120, 84 L.Ed. 494 (1939) ("... the trustee need not pay the rent during the probationary period, and the court will hold off the lessor and force him to be content with the value of the use and occupancy meanwhile, though ordinarily it will fix that as the same amount of the rent.")

Allowing an administrative damage claim to the lessor because of the "potential benefit" to the estate for not having to decide was rejected. See, *In re Rhymes,* 14 B.R. 807, 5 CBC2d 478 (Bankr.D.Conn.1981) ("The liability for actual use and occupancy is based on the 'equitable principle of preventing unjust enrichment, rather than compensation of the creditor for loss to him.'")

Case law further limited the landlord's rights to enforce lease terms pending assumption or rejection. See e.g., *In re Braniff Airways, Inc.,* 783 F.2d 1283, 1285 (5th Cir.1986) ("The typical remedy for a party to an unexpired lease who is suffering economic losses as a result of a bankruptcy is to move for an order compelling the bankruptcy trustee to assume or reject the lease within a certain time period pursuant to Section 365(d)(2) of the Bankruptcy Code.") Citing 2 Collier on Bankruptcy, ¶¶ 365.01–.03 (15th Ed. and Supp.1985). Other remedy provisions contained within the Bankruptcy Code were generally considered to be inapplicable to the landlord's situation. See, *In re Easthampton Sand & Gravel Co., Inc.,* 25 B.R. 193, 198 (Bankr.E.D.N.Y.1982) ("within a Chapter 11 reorganization, the debtor is to be afforded a reasonable time to make its assumption or rejection decision, subject to the limitation that it must be made before confirmation ... *Prior to the debtor's election, the exercise of creditors' rights under § 362(d) are preempted.*") (emphasis added)

Landlords frequently sought interim relief from the bankruptcy court in the form of an "adequate protection order" pending the debtor-lessee's decision. However, many courts held that even this relief was unavailable. One case in particular made an extensive survey of the law prior to the enactment of the Bankruptcy Code as well as the legislative history of the various sections which were predecessors to the final enactment of the Bankruptcy Code and concluded that "adequate protection" was unavailable to a landlord. *In re Sweetwater,* 40 B.R. 733 (Bankr.D.Utah 1984). *Sweetwater* specifically looked at the relationship between Sections 361, 363, and 365 and determined that Congress had not seen fit to require adequate protection of a landlord's interest pending the debtor's decision of whether to assume or reject. It concluded a lengthy review of the law by stating:

Congress, in enacting the Bankruptcy Code, recognized the competing interests of creditors. The origin of the adequate protection concept shows that it was intended to protect the constitutional rights of secured creditors in their collateral under fifth amendment's taking in due process clauses, and to enable them to receive the benefit of their bargain.

Congress recognized that the rights of lessors are fundamentally different from those of secured creditors. Congress has effectively dealt with the rights and remedies of lessors under Section 365 of the Code. The decision to seek an early determination of whether to assume or reject an unexpired lease rests with the lessor. If the debtor elects to assume, the lessor, unlike any other creditor, is entitled to have its entire prepetition debt cured, as well as adequate protection of future performance under the terms of the lease. If the lease is ultimately rejected, the estate is liable for the reasonable value of the leased property during the 'breathing spell' after the filing and before rejection.

The authoritative statement of congressional intent is the joint explanatory state-

ment of the floor managers. *That statement indicates that Congress intended to provide adequate protection to secured creditors only, not lessors. This conclusion is strengthened by a review of the entire legislative history and a comparison of the provisions of Sections 361, 363(e) and 365(b). To permit lessors adequate protection would defeat the purpose of those sections.* (emphasis added)

*Id.* at 745.

What is evident from case law prior to enactment of Section 365(d)(3) is that the landlord was limited in its ability to obtain relief from the bankruptcy court pending the debtor-lessee's election, even when the landlord wholly failed to meet any of its lease obligations. Since Congress had not obligated the debtor to do anything but make its election, the landlord was relegated at best to asking for some form of interim relief in the form of adequate protection, and at worst was limited to asking for an order setting a date by which the election had to be made. The cases all agree that if the lease was assumed, then the debtor's estate became liable for the full rent accruing under the terms of the lease; *In re Florida Airlines, Inc.,* 17 B.R. 683, 684 (Bankr.M.D.Fla.1982); *Braniff Airways, Inc.,* 783 F.2d at 1285, and if the lease was rejected, then the debtor's estate was liable only for the reasonable value of its use and occupancy of the premises. The lessor would then be entitled to receive administrative expense priority for that use is an amount which was ordinarily presumed to be the contract rental rate. *In re Sweetwater,* 40 B.R. at 745; *In re Energy Resources Co., Inc.,* 47 B.R. 337, 338–339 (Bankr.D.Mass.1985); *In re Braniff Airways, Inc.,* 783 F.2d at 1285.

Since the enactment of § 365(d)(3), courts have split on how the landlord's post-petition, pre-rejection claim should be treated. The split seems to categorize decisions which do not automatically grant administrative status to the lessor's claim against decisions that do automatically grant administrative status. Within this second category some of those courts have gone further and ruled that the administrative claim is entitled to some form of special or superpriority treatment.

## B. COURTS WHICH DO NOT AUTOMATICALLY GRANT ADMINISTRATIVE STATUS (MINORITY VIEW)

A minority of reported court opinions have taken the view that a lessor still has to meet the requirements of Section 503(b)(1) before any of the unpaid, post-petition lease obligations can be granted administrative status. The leading case for this proposition is the 9th Circuit Bankruptcy Appellate Panel opinion, *In re Orvco,* 95 B.R. 724, 726 (9th Cir. BAP 1989). In *Orvco,* a lease had been automatically rejected pursuant to Section 365(d)(4), when no action was taken to assume it after 60 days. Apparently little or no business had been conducted on the leased premises post-petition and the issue before the court was the amount and treatment of the lessor's post-petition claim. The lessor, citing Section 365(d)(3), sought a ruling that all of the payments called for by the lease would have to be paid, irrespective of use, occupancy or benefit to the bankruptcy estate and further sought a determination that such payment was administrative in nature and the estate should be compelled to make the payment immediately, without regard to amounts due and owing to other administrative claimants. The Bankruptcy Appellate Panel declined the lessor's invitation. Its analysis was as follows:

(1) It recognized the terms of Section 365(d)(3) and that they applied to business premises generally;

(2) It took note of the remarks of Senator Hatch contained in 130 Cong.Rec. S8894–95 (daily edition June 29, 1984);

(3) It recognized that "prior to the 1984 amendments, the law was clear that until assumption or rejection of the debtor's lease, the estate is liable only for the reasonable value of the use and occupancy of the premises." Citing 2 Collier on Bankruptcy, ¶ 365.-03[3] at 365–32 (15 ed. 1987);

(4) It recognized that there were reported bankruptcy decisions interpreting Section 365(d)(3) to require continued performance by the debtor of the full rent obligations, even where the fair market value is less and the debtor is not in full occupancy;

(5) Then it rejected the conclusion that administrative status or superpriority status had to be given to the lessor's claim. It cited Collier on Bankruptcy for the proposition that Section 365(d)(3) "does not expressly state what consequences follow from a violation of its terms." 3 Collier on Bankruptcy, ¶ 503.04[ii] at p. 503–27, n. 22 (15th ed. 1987);

(6) It also cited *In re Southwest Aircraft Services, Inc.,* in which the Ninth Circuit stated "We believe that Congress intended the bankruptcy courts to have the discretion to consider all the particular facts and circumstances involved in each bankruptcy case and *to decide whether the consequence of a violation of subsection 365(d)(3) should be* forfeiture of the assumed lease, some other penalty, *or no penalty at all.*" 831 F.2d 848, 854 (9th Cir.1987) (emphasis added).

*Orvco* found that once a lease is deemed rejected, nothing in the applicable Code section attempts to determine the administrative status of the unpaid rent obligation and concluded:

> In our view, the language of 365(d)(3) "notwithstanding section 503(b)(1)", means that notwithstanding the administrative or non-administrative status of a claim by a lessor, a bankruptcy court must order its payment pending assumption or rejection. It does not mean that the necessity for showing the reasonableness of the rent or of any of the other factors considered under Section 503(b)(1)(A) has been completely abrogated. Accordingly, we hold that when a lease is deemed rejected, a lessor must establish its claim for administrative status under Section 503(b)(1)(A), the specific section governing such status.

*Id.* at 728.

*Orvco* also rejected the lessor's claim that it was entitled to some form of superpriority status claim if it was determined to have an administrative claim. The lessor had argued that the language of Section 365(d)(3) requiring "timely performance" compelled immediate and full payment, even without regard to the estate's ability to pay other administrative claimants. The Bankruptcy Appellate Panel, however, felt that in the absence of express language to that effect, a superpriority administrative status would not be granted automatically.

> [A]fter the rejection of the lease, the payment of an administrative claim for rent, like all other administrative claims is within the sound discretion of the bankruptcy court and should be determined under Section 503.

*Id.* at 728.

Other courts have agreed with *Orvco* that before a lessor's unpaid post-petition obligations can receive administrative status they must meet the strictures of Section 503(b)(1). *In re Bilyk* involved a chapter 7 case in which the trustee was using leased premises to store certain personalty pending a sale. 101 B.R. 586, 587 (Bankr.E.D.Mo. 1989). Storage continued beyond 60 days after the order for relief without the lease otherwise being assumed. It therefore was automatically rejected pursuant to Section 365(d)(4). The lessor came to the court seeking payment of post-petition rent as an administrative expense. The court, citing *Orvco,* held that

> ... the terms of the pre-petition lease agreement are but one indication of the amount of a claim for post-petition rent. The Court must consider all the circumstances presented in connection with the requirement for allowance and payment and determine a fair and reasonable value of the post-petition lease.

*In re Bilyk,* 101 B.R. at 587.

*In re Daisy/Cadnetix, Inc.* also cited *Orvco* with approval. 126 B.R. 87 (Bankr.N.D.Cal. 1991). In this case, the debtor had vacated its premises immediately before an involuntary petition was filed against it. The debtor converted the case voluntarily and within 30 days of the order for relief the trustee moved to reject the lease. An order approving the rejection was signed approximately 57 days after the order for relief. The lessors filed an administrative expense priority claim for over $400,000.00 for the period between the date of the order for relief and the date the trustee filed the motion to reject, relying on Section 365(d)(3). The trustee objected, asserting that the requirements of Section 503(b)(1)(A) had not been met. The bankruptcy court, after reviewing the case law on

both sides of the issue concluded that "automatic allowance" of an administrative claim by a lessor for full contract rent irrespective of the "actual and necessary" standard of Section 503(b)(1)(A) was not compelled by its reading of Section 365(d)(3). It further stated that if an administrative claim was warranted, it would have the same status as all other chapter 11 administrative claims in the case. *Daisy/Cadnetix* at 91.

In *In re Laurence R. Smith, Inc.*, the facts revealed a debtor which had vacated its leasehold premises at a shopping center pre-petition. 127 B.R. 715 (Bankr.D.Conn.1991). No business was conducted at the location after the filing of the bankruptcy case. The debtor had filed an application with the court during the case to enlarge the time within which it had to decide whether or not to assume or reject the lease and that motion had been granted. The debtor later rejected the lease and the landlord moved for an order to have its unpaid post-petition rent allowed as an administrative expense. After reviewing Section 365(d)(3) and Section 503(b)(1)(A) and noting the different positions bankruptcy courts had taken on the issue, the court agreed with *Orvco*, that Section 503(b)(1)(A) still governed whether or not the post-petition claim of the lessor was granted administrative status or not. However, the court, without discussion, ruled that the debtor, having requested and obtained a court order extending its time to make the decision of whether or not to assume or reject, was liable to the lessor for administrative rent in the amount called for by the lease.

Another opinion following the *Orvco* analysis is *In re Tammey Jewels*, 116 B.R. 292 (Bankr.M.D.Fla.1990). That court stated that the question before it was whether or not the 1984 amendments had abrogated the "actual use and occupancy doctrine" with respect to nonresidential real estate leases, thus requiring post-petition payments and performance of all lease obligations regard-

less of the nature and extent of the debtor in possession's use of the premises. It then reviewed a number of the opinions which had held to that effect and concluded:

> Notwithstanding the foregoing authorities, this Court is satisfied that nothing in the language of Section 365(d)(3) requires the granting of administrative status to claims by lessors for post-petition rent accrued but not paid by the Trustee or Debtor. The 1984 amendments have not changed the necessity for showing the reasonableness of the rent or any of the other factors considered under Section 503(b)(1)(A).

*Tammey Jewels* at 294.

The court noted that the lessor had other remedies such as seeking relief from the automatic stay and eviction or shortening the time to assume or reject and further stated:

> It would truly be an unfair proposition to permit the landlord to sit idly by and not seek either payment or recovery of the premises by relying on the fact that his contractual rent will be accorded administrative priority occupied (sic) and presented no benefit to the estate.

*Tammey Jewels* at 294.

## C. COURTS WHICH DO AUTOMATICALLY GRANT ADMINISTRATIVE STATUS (MAJORITY VIEW)

The majority of reported opinions[5] have decided that the language, legislative history and principles underlying Section 365(d)(3) compel a conclusion that the lessor is entitled to an administrative claim for all accrued, post-petition obligations called for in the lease irrespective of any benefit accruing to the bankruptcy estate. One case which states the majority perspective in a clear and concise manner is *In re Worths Stores Corp.*, 135 B.R. 112 (Bankr.E.D.Mo.1991). One day before filing bankruptcy the debtor vacated its leased premises. On the very day the petition was filed (April 9, 1991) the debtor

---

5. It is certainly a fact that the majority of contested matters in bankruptcy courts do not end up with reported opinions after a decision is made. *Orvco* and *Southwest Aircraft, supra,* were decided in the 9th Circuit which has an extremely heavy bankruptcy caseload. It may be

that the balance of decisions actually being made on this issue weigh in favor of the "minority" position. The point is that counting reported positions on one's fingers is not necessarily helpful in the final analysis.

also filed a motion to reject its lease. The court ultimately approved the motion by order signed May 24, 1991. Thereafter the lessor filed a motion to recover over $28,-000.00 in post-petition, pre-rejection rent obligations and attorney's fees relying on Section 365(d)(3). The court originally granted the lessor's motion but, after the debtor filed a motion for rehearing, the court readdressed the issue identifying it as "whether a nonresidential real property lessor is entitled to administrative expense priority for post-petition/pre-rejection lease payments under Section 365(d)(3), or whether the lessor must meet the requirements of Section 503(b)(1)(A) in order to establish an administrative expense priority." *Worths Stores Corp.*, 135 B.R. at 114.

This court also reviewed Sections 365(d)(3) and 503(b)(1) and took note of the two developing lines of cases. It recognized that prior to the 1984 amendments a landlord's claim for post-petition rent was limited to the estate's liability for the "reasonable value of the use and occupancy of the premises." *Worths Stores Corp.*, 135 B.R. at 114. The court decided that the 1984 amendments evidenced a clear and unambiguous congressional intent that lessors receive the rent provided for in the lease until the lease is rejected (citing Senator Hatch's comments). It concluded that the majority line of cases using this same approach find the logic sufficient to determine that the *"obligation is made expressly independent of the normal standards for administrative expense claims under Section 503(b)(1) and constitutes an administrative expense payable without notice and a hearing."* (emphasis added). *Id.* at 115, citing *In re Longua,* 58 B.R. 503, 505 (Bankr.W.D.Wis.1986). The court amplified the policy reasons which it also felt support this conclusion:

> To rule otherwise would give the [debtor] ... an incentive during the first 60 days of the case not to comply with the prompt payment mandate of Section 365(b)(3) if there is a chance the lease will be rejected and may be at an above market rent or if the debtor has not fully occupied the premises.

*Worths Stores Corp.*, 135 B.R. at 115, citing *In re Washington Bancorporation,* 125 B.R. 328, 329 (Bankr.D.D.C.1991).

This court also stated its belief that Section 365(d)(3) was a specific provision which should control over the more general language of Section 503(b)(1)(A). It concluded that:

> ... in a chapter 11 case a request for payment of post-petition, pre-rejection rent pursuant to Section 365(d)(3) need not be made prior to rejection and need not meet the requirements of Section 503(b)(1)(A) in order to be given administrative expense priority.

*Id.* at 116.

The *Worths Stores Corp.* use of legislative history, case law, policy considerations and rules of statutory construction is substantially the same approach followed by the other reported opinions following the majority view. See e.g., *In re ABC Books & School Supplies,* 121 B.R. 329 (Bankr.S.D.Ohio 1990).

> Congress in the legislative history and in the final enactment of Section 365(d)(3) and (d)(4) has shown greater concern for easing the burden on landlords than for protecting assets for the benefit of all creditors. Congress made it clear that the rental for the sixty-day period is governed exclusively by the terms of the lease.

*ABC Books,* 121 B.R. at 332.

See also, *In re Appletree Markets, Inc.,* 139 B.R. 417 (Bankr.S.D.Tex.1992) citing the 1984 amendments, ("This change in Section 365(d)(3) eliminated the notice, application and hearing practice for payment of rentals as administrative expenses prevalent in pre-1984 code practice.")

*In re Cardian Mortgage Corp.* is a case in which the debtor had not occupied the premises post-petition. 127 B.R. 14 (Bankr. E.D.Va.1991). The lease was ultimately rejected by court order after expiration of 60 days. Noting the conflict between courts on the issue and recognizing that the debtor had not occupied the leased premises for any purposes, the court nevertheless sided with the majority and found the post-petition

claim of the lessor to be entitled to full payment as an administrative claim.

At first glance it may seem unfair and contrary to the bankruptcy policy of maximization of the estate's value to impose liability for abandoned leaseholds. The lessor, however, is in the unique position among bankruptcy creditors of being forced to extend credit by allowing the use of its property during the period after the commencement of the case but before formal rejection of the lease with the possibility of getting little or no compensation in return if it is rejected. (footnote citing Section 365(g)). The distinction between lessors and other creditors becomes more apparent upon consideration that the land likely continues to accrue mortgage, tax, maintenance, insurance, and other obligations that the lessor must still pay.... [These obligations accrued] prior to rejection are not contingent upon any occupancy of the property; rather, they depend only on the existence of an unexpired, nonresidential property lease.

*Cardian Mortgage Corp.*, 127 B.R. at 16.

In *In re Galvan*, 57 B.R. 732 (Bankr. S.D.Cal.1986) the court also determined that Section 365(d)(3) requires immediate payment:

Apparently, a legislative decision has been made to sacrifice the potential for realizing on certain assets of the estate for the benefit of all creditors so as to minimize the potential for harm which might be caused by delay in payment to only one class of creditor—landlords. This is a judgment within the province of the legislature to make and not within the province of the Court to change no matter how deleterious the effect may be on maximizing recovery in liquidation proceedings. After all, it may be argued that the time limitations imposed by Section 365(d)(3) only spread to all creditors that burden which was previously borne only by the landlord.

*Galvan*, 57 B.R. at 734, citing *In re By–Rite Distributing, Inc.*, 47 B.R. 660, 665 (Bankr. D.Utah 1985). See also, *In re Tobago Bay Trading Co.*, 142 B.R. 528, (Bankr.N.D.Ga. 1991) (The court opined that the minority view only served to discourage debtors' compliance with Section 365(d)(3) and to encourage defaults.) and *In re Washington Manufacturing Co.*, 1993 WL 156083 (Bankr. M.D.Tenn.1993) (not reported in Bankruptcy Reporter).

As quoted above, the statute itself dictates timely satisfaction of the obligations arising under a nonresidential lease pending assumption or rejection 'notwithstanding Section 503(b)(1) of [the Bankruptcy Code].' The plain ordinary meaning ascribed to the term 'notwithstanding' is 'in spite of' and 'in spite of the fact that.' Webster's II New Riverside University Dictionary, p. 805 (1988). Therefore, it is reasonable to conclude that in the context of Section 365(d)(3) the term 'notwithstanding' can only mean that timely satisfaction of the post-petition lease obligations arising prior to rejection or assumption of the lease is required 'in spite' of any opposing conditions of Section 503(b)(1).

*Washington Manufacturing* at 9.

Other reported opinions reach the same outcome. *In re Appliance Store, Inc.*, 148 B.R. 226 (Bankr.W.D.Pa.1992); *In re Buyer's Club Markets, Inc.*, 115 B.R. 700 (Bankr. D.Colo.1990); *In re Cardinal Industries, Inc.*, 109 B.R. 738 (Bankr.S.D.Ohio 1989); *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879 (Bankr.E.D.N.Y.1986); *In re CSVA, Inc.*, 140 B.R. 116 (Bankr.W.D.N.C.1992); *In re Damianopoulos*, 93 B.R. 3 (Bankr.N.D.N.Y. 1988); *In re Dieckhaus Stationers of King of Prussia, Inc.*, 73 B.R. 969 (Bankr.E.D.Pa. 1987); *In re Four Star Pizza, Inc.*, 135 B.R. 498 (Bankr.W.D.Pa.1992); *In re Gillis*, 92 B.R. 461 (Bankr.D.Haw.1988); *In re Granada*, 88 B.R. 369 (Bankr.D.Utah 1988); *In re Homeowner's Outlet Mall Exchange, Inc.*, 89 B.R. 965 (Bankr.S.D.Fla.1988); *In re Lunn*, 129 B.R. 476 (Bankr.N.D.Ohio 1991); *In re M.H.I., Inc.*, 61 B.R. 69 (Bankr.D.Md.1986); *In re National Oil Co.*, 80 B.R. 525 (Bankr. D.Colo.1987); *In re 1 Potato 2, Inc.*, 58 B.R. 752 (Bankr.D.Minn.1986); *In re O.P. Held, Inc.*, 77 B.R. 388 (Bankr.N.D.N.Y.1987); *In re Papercraft Corp.*, 126 B.R. 926 (Bankr. W.D.Pa.1991); *In re Paul Harris Stores, Inc.*, 148 B.R. 307 (S.D.Ind.1992); *In re Re-*

*gency Chevrolet, Inc.,* 122 B.R. 60 (Bankr. S.D.Tex.1990); *In re Revco D.S., Inc.,* 109 B.R. 264 (Bankr.N.D.Ohio 1989); *In re Tandem Group, Inc.,* 61 B.R. 738 (Bankr. C.D.Cal.1986); *In re TDC Development Corp.,* 73 B.R. 135 (Bankr.N.D.Tex.1987); *In re T.F.P. Resources, Inc.,* 56 B.R. 112 (Bankr.S.D.N.Y.1985); *In re U.S. Fax, Inc.,* 114 B.R. 70 (Bankr.E.D.Pa.1990); *In re Virginia Packaging Supply Co., Inc.,* 122 B.R. 491 (Bankr.E.D.Va.1990); *In re Wingspread Corp.,* 116 B.R. 915 (Bankr.S.D.N.Y.1990); *In re Western Monetary Consultants,* 100 B.R. 545 (Bankr.D.Colo.1989).

Among all of these opinions, the most forceful and direct attempt to refute the *Orvco* analysis is *In re Wingspread Corp.,* supra. After considering the divergent line of cases, the statutory language, and underlying principles involved and legislative history impacting the decision, this court states:

> I do not agree with *Orvco*'s interpretation of section 365(d)(3). nor with its interpretation of the 'notwithstanding section 503(b)(1)' language. I read 'notwithstanding section 503(b)(1)' as meaning that irrespective of whether the payments required under the lease meet the usual requirements for administrative status, reasonableness and benefit to the estate, they are unconditionally due (unless the landlord has engaged in some act which warrants reduction, denial or deferral of payment). By requiring the trustee to pay 'all obligations of the debtor', Congress could not have meant for the court to look into the reasonableness of the obligations or the extent to which the debtor utilized the premises during the 60–day period, for otherwise Congress would not have said all obligations.
>
> The *Orvco* reading would flout the intent of Congress in that the landlord would still be forced to provide current services while awaiting an evidentiary hearing to determine the actual amount the debtor owed it. This interpretation would place a burden on the bankruptcy courts to hear and determine the value of the debtor's use of the premises within 60 days after the petition was filed, irrespective of when the landlord's motion was brought, because the

court cannot extend the time for such payment beyond the 60–day period. Section 365(d)(3).

> The only other alternative would be to construe the statute to require the trustee to pay the obligations during the 60–day period and sue later to recover any over claimed payments, an awkward procedure which cannot have been envisioned. Accordingly, in agreement with the pre-*Orvco* decisions, I believe that during the 60 days after an order for relief is entered or within such extensions as are granted by the court prior to assumption or rejection, the debtor must pay the rent reserved under the lease.

*Wingspread,* 116 B.R. at 926.

## D. MAJORITY VIEW COURTS WHICH AUTOMATICALLY GRANT SUPERPRIORITY STATUS

Within the majority view are a few courts which have inferred from the language of Section 365(d)(3) that the lessor's claim is actually entitled to some priority status which is better than a mere administrative claim.

One of the first reported decisions contending that Section 365(d)(3) accorded some status greater than a first priority under Sections 503(b) and 507(a) was *In re Rare Coin Galleries of America, Inc.,* 72 B.R. 415 (D.Md.1987).

> Section 365(d)(3) clearly requires the continued performance by the trustee of the full rent obligations under the lease until the decision to assume or reject the lease is made. (Citations omitted) Thus, the command of Section 365(d)(3) that the debtor shall 'timely' perform the rent obligations means that the trustee must pay the rent as it comes due.... *Section 365(d)(3) thus gives a special administrative claim priority to post-petition rent due under a nonresidential lease.* (emphasis added)

*Rare Coin Galleries of America,* 72 B.R. at 416.

The most forceful opinion to date which agrees that there is some form of "special" or "superpriority" status is *In re Telesphere Communications, Inc.,* 148 B.R. 525 (Bankr.

N.D.Ill.1992). Under the facts of *Telesphere,* which involved a parent company and two subsidiary companies, each undergoing a liquidation, the question of making payment for certain post-petition rental payments was raised. The debtor resisted immediate payment because of fears, which the bankruptcy court found to be genuine, that the estate might not be able to pay all administrative claimants in full. The court defined the issue before it as one which

> ... presents a narrow legal issue: whether Section 365(d)(3), by mandating the trustee's 'timely performance' of the debtor's post-petition lease obligations, gives the lessor a right to payment from the estate independent of the rights of administrative claimants under Section 503(b), regardless of administrative solvency.

*Id.* at 527.

Telesphere recognized that a majority of decisions construing Section 503(b) in the context of potential administrative insolvency found that because Congress did not expressly provide for any superpriority, then payments should be made only when other administrative claims were paid. See e.g., *In re Granada, Inc.,* 88 B.R. 369, 375 (Bankr. D.Utah 1988) (Unpaid Section 365(d)(3) expenses do not enjoy a superpriority status over other Section 507(a) administrative claims. When immediate payment of those expenses is properly sought, full payment must be made absent a showing by the trustee of "substantial doubt" that there will ultimately be sufficient funds available to pay all administrative expenses.) The court in *Telesphere* reasoned differently, stating that the primary difficulty it had with the majority view was:

> ... their assumption that payments made under Section 365(d)(3) are payments of administrative expenses under Section 503(b)(1). This assumption is a linchpin of the decisions: they reason that if Section 365(d)(3) payments satisfy administrative expenses, then they must be paid pro rata with other Section 503(b) expenses—pursuant to the priority scheme of Section 507(a)—because Congress did

not expressly provide for any superpriority. (cite omitted).

*Telesphere,* 148 B.R. at 529.

*Telesphere* rejected this assumption, stating its opinion that Section 365(d)(3) payments were not payments of administrative expenses pursuant to Section 503(b)(1). *Id.* at 530. An extended quotation shows the analysis from this point:

> Section 503(b)(1)(A) describes "administrative expenses" as including "the actually, necessary cost and expenses of preserving the estate." The rental payments involved in the present case fit within this description. However, Section 503 does not set forth the exclusive procedure for paying such expenses. The Bankruptcy Code contains two distinct procedures for the payment of administrative expenses. One of these procedures—the one that involves Section 503(b)(1)—is supervised by the court, and requires application, notice and hearing. (Footnote omitted). The court supervised procedure requires pro rata payment of administrative claims, pursuant to Section 726(b) unless the claim involved is given express superpriority.

> The other procedure for payment of administrative expenses does not involve Section 503(b)(1) or any court supervision. Section 1108 of the Code authorizes the trustee (and hence the debtor in possession under Section 1107) to operate the business of a chapter 11 debtor unless otherwise ordered by the court. Section 363(c)(1) allows the trustee or debtor in possession, authorized to operate the debtor's business, to 'use property of the estate in the ordinary course of business without notice or a hearing.' Thus, a trustee or debtor in possession may expend unencumbered cash (property of the estate), in the ordinary course of the debtor's business to pay providers of goods and services to the estate. This alternative to court-supervised payment of administrative expenses may be referred to as 'operational payments'. See *United States ex rel. Harrison v. Estate of Deutscher (In re H & S Transportation Co.),* 115 B.R. 592, 600 (M.D.Tenn.1990) (distinguishing professional activities involved in the administra-

tion of the estate from activities involved in its operation).

In contrast to payments made pursuant to the court supervised procedure, there is no requirement that operational payments be made pro rata with other administrative expenses; operational payments are final. This point was made emphatically in *In re Vernon Sand & Gravel, Inc.*, 109 B.R. 255, 257 (Bankr.N.D.Ohio 1989) (quote omitted).

*Telesphere,* 148 B.R. at 530.

The court then discusses the practical reasons that ordinary post-petition payments are not recoverable if the estate is later found to be insufficiently solvent to pay all administrative claims in full. It then continues with its analysis:

Given this structure of the Code, the language of Section 365(d)(3) should be read as requiring that rental payments be made according to the procedure for operational payments under Section 363(c)(1) (footnote omitted). There is nothing in the language of Section 365(d)(3) suggesting that it involves any of the procedures for court supervised payment. To the contrary, Section 365(d)(3) provides that its terms apply 'notwithstanding Section 503(b)(1)'—the section providing a right to court supervised payment—and it requires the

trustee or debtor in possession to act without application and without court review. Consequently, and contrary to the reasoning of the majority decisions, there would have been no reason for Congress to have provided any express grant of superpriority for Section 365(d)(3) rent payments—*such a 'superpriority' is implicit in the directions that the debtor make the payments without court involvement.* (Footnote omitted). The absence of an express grant of superpriority cannot, then, be a basis for disregarding the plain language of Section 365(d)(3).

Pursuant to the plain language of Section 365(d)(3), the trustee or debtor in possession has a duty, prior to assumption or rejection of a lease of nonresidential real property, to make timely payment of the full rent due, from any available funds,

(subject to Section 363(c)(2) of the Code), regardless of the administrative solvency of the estate. *No specific remedy is provided by the Code for violation of this duty. However, Section 105(a) of the Code provides authorization to the courts to 'issue any order' process, or judgment necessary or appropriate' to carry out the provisions of the Code. This provision allows the court to fashion an appropriate remedy where the Code is silent.* (Cite omitted). The most appropriate remedy in the present case would place (lessor) in the position it would have occupied if the debtor had complied with the requirements of Section 365(d)(3). (emphasis added)

*Telesphere,* 148 B.R. at 531–532.

The court then ordered the debtor to make immediate payment, even though it would most likely not have sufficient funds to pay all post-petition administrative claims. The only opinion reported which directly cited *Telesphere* at the time of the writing of this opinion was *In re Duckwall–ALCO Stores, Inc.*, 150 B.R. 965 (D.Kan.1993). The district court in that opinion agreed with *Telesphere* and stated:

Although these payments have been characterized by many courts, including the court below, as 'administrative expenses', this court cannot agree. Lease obligations under Section 365(d)(3) are not subject to requirements of Section 503 for payment of administrative expenses ... lease payments payable under Section 365(d)(3) are distinct from Section 503 administrative expenses and constitute a unique category under the Bankruptcy Code.

*Duckwall–ALCO Stores, Inc.*, 150 B.R. at 971, n. 10, citing *Telesphere* at 528 n. 6.

## VII. ANALYSIS

■ One or more of the following points are cited by the majority view courts as their rationale for interpreting Section 365(d)(3) to mandate an automatic administrative allowance, or better, for the landlord's post-petition pre-rejection claim.

1. The language of Section 365(d)(3) expresses a clear and unambiguous intent that

the debtor-lessee should pay, pending a decision on whether to assume or to reject the lease;

2. To rule that the landlord's claim is not automatically entitled to an administrative priority would somehow give the debtor an incentive during the first sixty days of the case not to perform;

3. Section 365(d)(3) is a specific statute which controls over the general remedy provisions of Section 503(b); and/or

4. The landlord's claim is unique and constitutes a unique category under the Bankruptcy Code, with better treatment than an administrative claim. (The *Telesphere* analysis).

Each of these points provide support for the majority view. However, upon reflection of the law as it existed in 1984, and upon careful consideration of the structure of the Code, this court believes the *Orvco* analysis to be the better approach. Each of the points relied on by the majority view will be separately addressed to show how this court comes to its conclusion.

*Point One*—The language in Section 365(d)(3) expresses a clear and unambiguous intent that the debtor-lessee should perform, pending its decision on assumption or rejection. This court agrees with this statement. However, when Congress made the amendments in 1984 it understood that it did not write on a clean slate with respect to bankruptcy law. *Dewsnup v. Timm*, —— U.S. ——, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). The Bankruptcy Code obligates a debtor to perform in many ways that are equally clear and unambiguous. There are numerous examples, but only a few should suffice to see this point. See, e.g., Section 521 (debtors *shall* timely file schedules . . . and surrender to the trustee property of the estate); Section 363(c)(2) (debtor may not use cash collateral without consent of entity with interest in such collateral or after receiving court approval *after notice and a hearing*); and Section 365(d)(4) (debtor has to make the decision to assume or to reject within 60 days, or such time period as the court may allow). Congress has spelled out a remedy for some of these obligations if the debtor defaults;

for others, Congress did not. For example, no specific remedy is afforded an affected creditor if the Debtor fails to comply with the clear restriction on use of cash collateral, while the debtor's failure to assume or reject within 60 days is specifically addressed (lease is deemed rejected and trustee shall surrender the premises to the lessor.). This failure to provide for a specific remedy for a debtor's default of a Code-imposed duty then is not something unique to Section 365(d)(3). It is obvious that Congress knows how to provide a specific remedy for breaches of Code obligations, but does not necessarily choose to do so for each affirmative duty imposed on a debtor.

■ This lack of a specific remedy is not fatal to a creditor, however. The Code itself provides a number of general remedies which become available where a Debtor fails to perform. See e.g., Section 707(a) (case may be dismissed for "*cause*"), Section 1104(a) (court may order appointment of a trustee for "*cause*"); Section 1112(b) (court may convert or dismiss for "*cause*"); Section 1208(c) (court may dismiss for "*cause*"); and Section 1307(c) (court may convert or dismiss for "*cause*"). (emphasis added). Therefore, if a debtor fails to file schedules on a timely basis or turn over property to the estate, such inaction could provide sufficient "cause" to support a party-in-interest's request for appointment of a trustee or conversion of the case. The same would be true for a violation by the debtor of the restriction on use of cash collateral. Recall that all of these general remedies were not readily available to landlords prior to the 1984 amendments. By now compelling a debtor-lessee to provide adequate protection, Congress has provided "cause" to allow landlords access to these previously existing, but generally unavailable remedy provisions in the Code for any tenant defaults. So, in the view of this court, the struggle to find an implied remedy in the form of an automatic administrative claim is not compelled solely because Congress did not provide for a specific remedy in Section 365(d)(3).

*Point Two*—A court's failure to automatically allow an administrative claim to the landlord would provide some incentive to the

debtor to ignore Section 365(d)(3). See, e.g., *In re Wingspread Corp.,* 116 B.R. at 926–927 (the *Orvco* reading would flout the intent of Congress in that the landlord would still be forced to provide current services while awaiting an evidentiary hearing to determine the actual amount the debtor owed it); *In re Longua,* 58 B.R. at 505 ("to rule otherwise would give the [debtor] ... an incentive during the first sixty days of the case not to comply with the prompt payment mandate of Section 365(b)(3) if there is a chance the lease will be rejected and may be at an above-market rent or if the debtor has not fully occupied the premises."); and *In re Tobago Bay Trading Co.,* 142 B.R. at 533, (minority view only serves to discourage debtors compliance with Section 365(d)(3) and to encourage defaults.).

On its face, this is the best argument made for interpreting Section 365(d)(3) as the majority of reported opinions do. However, this rationale completely overlooks remedy provisions in the Code like Section 362(f):

> Upon request of a party in interest, the court, *with or without a hearing shall grant* such relief from the stay provided under subsection (a) of this section as is necessary to prevent irreparable damage to the interest of an entity in property if such interest will suffer damage before there is an opportunity for notice and a hearing under subsection (d) or (e) of this section. (emphasis added).

It also overlooks section 363(e):

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, *or leased* or proposed to be used or leased, by the trustee, the court with or without a hearing, *shall prohibit or condition such use,* sale or lease as is necessary to provide adequate protection of such interest. (emphasis added)

Congress surely could envision at the time it enacted this amendment that some debtor-lessees, purposefully or otherwise, would fail to perform. Yet Congress failed to impose any specific remedy for such foreseeable failure when, as already discussed, it knew how to do so. The question to ask, in trying to determine Congress' intent, is why did it not provide a specific remedy. One logical reason is that the Code already contained a number of general remedy provisions. Case law at the time the amendment was enacted was pretty uniform that the only real remedy available to a landlord was a court-ordered deadline for the assumption or rejection decision. Many courts did not even permit adequate protection pending the decision. However, now that Congress had imposed an affirmative duty on a debtor to perform, any default would be "cause" for some relief from the court. It is logical to believe that Congress understood that the landlord, after the enactment of Section 365(d)(3), would now be able to avail itself of the remedy provisions previously unavailable to it. Two of these remedies, Sections 362(f) and 363(e), afford the landlord an opportunity for immediate relief. Unlike the majority position, this court sees little incentive for a debtor to intentionally default on its post-petition obligation to perform and run the risk that the automatic stay will be modified or terminated or that its right of possession of the premises will be modified or terminated. This is even more so where the landlord can get such relief with or without notice and with or without the requirement of an actual hearing. The landlord's rights just under these two remedy provisions appear to sufficiently counterbalance any gamesmanship on the part of the debtor-lessee which the majority of reported opinions worried about. Congress had to be aware that providing the landlord with "cause" handed the landlord all of the Code's remedies which had frequently been withheld under the decisions prior to 1984. Any rational thinking debtor and debtor's counsel would be ill-advised to believe that intentional inaction provides them only with an upside position in light of these two remedy provisions.

*Point Three*—The specific language of Section 365(d)(3) should control over the more general language of Section 503(b)(1)(A). This canon of statutory construction, that a specific provision controls over a general provision, only applies however, where there is an inescapable conflict between the provisions. C. Sands, Statutes and Statutory Construction, Section 46.05 (4th ed. 1972);

*Aeron Marine Shipping Co., et al. v. United States of America, et al.*, 695 F.2d 567, 575 (C.A.D.C.1982). Here we are comparing a provision which imposes a duty on the debtor, without any expressed remedy for its breach, with a provision conferring administrative status for claims which meet certain criteria. One may, as the cases have shown, argue the relationship of one to the other, but they are not, by any means, in "inescapable conflict." The Code has remedy provisions which can, and quite clearly, do apply where the debtor defaults under Section 365(d)(3). This canon of statutory construction is simply not applicable to the problem at hand.

■ *Point Four*—The view expressed in the *Telesphere* line of cases. This court believes their conclusions to be incorrect. Essentially the *Telesphere* court finds (1) that the Code mandated payment of Section 365(d)(3) makes the payment an ordinary-course-of-business obligation; (2) that unencumbered cash of the estate can be utilized to make such ordinary-course-of-business-payments; (3) that ordinary-course-of-business payments may be made without court supervision or approval; (4) that such payments may be made without having to be made pro rata with other "administrative expenses"; and (5) that such payments, when made, are final and are not subject to disgorgement in the event the estate is later found to be insufficiently solvent to pay all administrative claimants in full. *Telesphere*, 148 B.R. at 530–532. This court agrees with their analysis to this point. However, merely because holders of "operational expense" claims may be paid without court approval and such payments may not later be disgorged, does not therefore mandate that some form of "superpriority" status be imposed.

The language directing payment does not provide for any form of priority status, and the fact that rent, if paid, could not later be disgorged does not require this interpretation. The Code authorizes the bankruptcy estate to obtain credit in the "ordinary course of business" without court supervision or approval. 11 U.S.C. § 364(a). It also authorizes the estate to use unencumbered assets in the "ordinary course of business" without court supervision or approval. 11 U.S.C. § 363(c). Therefore, when property of the estate is transferred under these conditions to pay estate debts incurred under these conditions, the Code prevents such transfers from later being avoided. Section 549(a) provides the trustee with the power to avoid post-petition transfers of estate property. This avoidance power is inapplicable however if the transfer was authorized by court order or by Title 11. Section 550 provides that the transferred property or its value may be recovered from the transferee. Since transfers made in the "ordinary course of business" are authorized by Title 11, Section 549 is inapplicable and Section 550 cannot be used to recover them.

Point 1 discussed above shows that the clear language of Section 365(d)(3) is not by itself sufficient to infer some intent on the part of Congress that landlord's receive automatic administrative status for unpaid, post-petition rents. The mere fact that, if paid, rents could not later be disgorged is equally unpersuasive to infer this intent. All providers of post-petition credit, goods, or services are protected by Sections 549 and 550. If this protection infers a superpriority status, why is it not equally applicable to other post-petition creditors. Alternatively, if Section 105 can be used to compel payment because the claim is an "operational expense", why can't other similarly situated creditors make this same argument?

Another problem this court has with the *Telesphere* analysis is that it doesn't really clarify exactly what the "superpriority" claim is. Section 507(b) [6] of the Code gives certain creditors an administrative priority. Section

---

**6.** (b) If the trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(1) of this section arising from the stay of action against such property under section 362 of this title, from the use, sale, or lease of such property under section 363 of this title, or from the granting of a lien under section 364(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection.

364(c)(1) authorizes the court to allow the estate to obtain unsecured credit "with priority over any or all administrative expenses of the kind specified in Section 503(b) or 507(b) ...". Is the *Telesphere* priority above, below, or in between Section 507(b) and 364(c)? Since Section 503(b) provides beneficial treatment for creditors that provide the estate with actual, necessary items to preserve the estate, this court cannot find that the analysis provided in *Telesphere* compels a superpriority status for all unpaid post-petition rent claims of lessors, especially where no occupancy, use, or benefit is afforded the bankruptcy estate.

## VIII. CONCLUSION

Since the enactment of Section 365(d)(3), courts have struggled with the meaning of the language in Section 365(d)(3) compelling the trustee to perform all lease obligations "notwithstanding Section 503(b)(1)", especially since Congress provided no statement of the consequences for non-compliance. Reasonable minds can and have differed over the intent of Congress while trying to determine what the landlord's remedy is.

After reviewing the history of the treatment of lessors and the rationale stated by the divergent line of cases attempting to construe Section 365(d)(3), this court concludes that the *Orvco* analysis is the more appropriate one.

In *Telesphere*, the court decided that Congress did not expressly provide for a "superpriority claim" because it found such status "implicit in the directions that the debtor make payments without court involvement." *Telesphere*, 148 B.R. at 532. Other courts following the majority view have found that administrative claims are required by this same directive.

This court however believes that Congress chose not to spell out the consequences of default under Section 365(d)(3), not because it believed that courts would somehow discern its intent to automatically allow an administrative or superpriority claim, but because it felt that the landlord's interest was now adequately protected by other provisions in the Code. Congress intended to provide better protection for the landlord and it has.

Case law which limited a landlord's right to receive any adequate protection pending the debtor's election has been abrogated by this amendment. All remedies provisions of the Code are now clearly available to a landlord if there is a default under this section and, as previously discussed, those remedies are sufficient to avoid the concerns that some majority view courts raised that a debtor might be tempted to intentionally ignore Section 365(d)(3) in order to gain some advantage. This interpretation also avoids any conflict with prior, well established principles of bankruptcy that the majority view runs afoul of. After all, Congress not only failed to specify a specific remedy for a default under Section 365(d)(3), it also failed to amend any existing section of the Code dealing with allowance of administrative claims or priority claims. Such failure to amend is fully consistent with the *Orvco* analysis however, because amendment was not needed.

No argument was advanced in this case and no evidence was introduced to show how the estate may have benefitted by the Debtor having received an extension of the time permitted to make its election. This court does not believe that it can impose or discern a per se benefit from the mere filing of a motion to extend.

■ Of course, many landlord's claims will be shown to be entitled to allowance as administrative claims and this court agrees with the conclusion that once administrative rent is shown to be due, it is now measured by the rent reserved in the lease and not through some analysis of what the actual fair market value for the time period at issue is. 2 Collier on Bankruptcy, ¶ 365.03[4] (15th ed.). Under the facts of this case the Debtor has conceded that it owes four days administrative rent to Centennial.

For these reasons, Centennial's Motion For Allowance of An Administrative claim is allowed for four days "use." With no other evidence to measure it, this court previously determined that the full contract rate, for four days, is the sum of $722.63. All other amounts sought are denied. A separate or-

der of even date herewith will effectuate this memorandum opinion.

IT IS SO ORDERED.

### *ORDER GRANTING IN PART AND DE- NYING IN PART THE MOTION OF CENTENNIAL MORTGAGE CORP. FOR ALLOWANCE OF PRIORITY EXPENSE*

Came on before this court to be considered the motion of Centennial Mortgage Corp. for an allowance of a priority expense and the objection of the Debtor. This court previously considered this matter and, by separate memorandum opinion of even date herewith, has made its Findings of Fact and Conclusions of Law. The court finds that this is a contested matter over which it has jurisdiction under 28 U.S.C. § 1334(a) and (b), 28 U.S.C. § 151 and the standing order of reference in this District. It is also a core proceeding under 28 U.S.C. § 157(b)(2)(B).

Based upon such Findings of Fact and Conclusions of Law, this court has determined that Centennial Mortgage Corp. is entitled to an administrative claim under Section 503(b)(1) in the amount of $722.68. All other amounts for which it seeks administrative status are denied.

IT IS SO ORDERED.